# LESLY FAJARDO ET AL. *v.* BOSTON SCIENTIFIC CORPORATION ET AL.
## (SC 20455)

Robinson, C. J., and Palmer, D'Auria, Mullins,
Kahn and Ecker, Js.*

*Syllabus*

Pursuant to this court's decision in *Bifolck* v. *Philip Morris, Inc.* (324 Conn. 402), under the risk-utility test, a product is in a defective condition that is unreasonably dangerous to the consumer if (1) a reasonable alternative design that would have avoided or reduced the risk of harm was available and the absence of that alternative design renders the product unreasonably dangerous, or (2) the product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Fajardo *v.* Boston Scientific Corp.

The plaintiffs, F and F's husband, sought to recover damages from, among others, the defendant L, who was F's gynecologist, L's medical practice, and the defendant B Co. for personal injuries that F sustained in connection with an unsuccessful surgery in which a transvaginal mesh sling designed by B Co., known as the Obtryx, was implanted in F's body for the purpose of treating F's stress urinary incontinence. During F's annual health examination, L diagnosed F with pelvic organ prolapse and recommended that he perform a surgical repair known as a colporrhaphy. L also recommended that F undergo a sling procedure to rectify her stress urinary incontinence. Because L did not perform the sling procedure, he referred F to P, a urologist. P described to F the risks and benefits of, and alternatives to, the sling procedure, and F gave P her informed consent to proceed with both the colporrhaphy and the sling procedure. The procedures were scheduled for the same day but performed consecutively. Immediately after L performed the colporrhaphy, P implanted the Obtryx in F. Thereafter, F continued to experience pain and had the Obtryx removed. The plaintiffs' complaint included claims against L and L's medical practice, alleging that L had failed to obtain F's informed consent to the sling procedure and that L made innocent, negligent or intentional misrepresentations regarding the risks and benefits of the sling procedure. The complaint also alleged a product liability claim against B Co. under the Connecticut Product Liability Act (§ 52-572m et seq.), namely, that the defective design of the Obtryx caused F's injuries. Prior to trial, L and L's medical practice, and the plaintiffs, filed separate motions for summary judgment in connection with the informed consent and misrepresentation claims. Specifically, the plaintiffs claimed that L had assumed a duty to obtain F's informed consent for the sling procedure by discussing and recommending that procedure to F. The trial court disagreed and, instead, granted the motion for summary judgment filed by L and L's medical practice, concluding that the duty to obtain informed consent rests with the physician performing the procedure, namely, P. The trial court also rendered summary judgment for L and L's medical practice on the misrepresentation claims. The plaintiffs' product liability claim subsequently was tried to a jury. The plaintiffs introduced into evidence the testimony of a product design expert, R, and various medical studies, which referred to a class of mesh slings known as tension free vaginal tapes (TVTs) that are implanted in a retropubic fashion, unlike the Obtryx, which is implanted using a transobturator approach. R testified that all slings made of polypropylene mesh, including the Obtryx and a certain TVT, are defective and unreasonably dangerous, that the polypropylene mesh caused a foreign body reaction in F and contributed to her injuries, and that a surgery known as the Burch procedure was his preferred method to treat stress urinary incontinence. He also testified regarding what he considered to be defects in the Obtryx, specifically, its heat-sealed middle section and detangled edges, which produce a stiffer mesh. Before the trial court

Fajardo *v.* Boston Scientific Corp.

charged the jury, the plaintiffs e-mailed the court, requesting an instruction on both prongs of the risk-utility test. The court, however, declined to instruct the jury as to the reasonable alternative design prong and instructed the jury only with respect to the second prong regarding whether the design of the Obtryx was manifestly unreasonable. The jury returned a verdict for B Co., and the plaintiffs moved to set aside the verdict on the basis of the court's failure to give a reasonable alternative design instruction. The trial court denied that motion and rendered judgment in accordance with the jury's verdict, from which the plaintiffs appealed. *Held*:

1. The trial court properly rendered summary judgment for L and L's medical practice in connection with the plaintiffs' informed consent claim: this court previously had concluded, as a matter of law, that the duty to obtain a patient's informed consent rests solely with the physician who is to perform the procedure, and that jurisprudence was consistent with the rule recognized by most jurisdictions and legal and medical authorities that, when a physician refers a patient to a specialist for a consultation and that specialist performs the procedure, the specialist is solely responsible for educating the patient and obtaining her informed consent, even when the referring physician discussed the procedure with, or recommended it to, the patient; in the present case, the implantation of the Obtryx by P was an entirely separate procedure from the colporrhaphy performed by L, P was solely responsible for the sling procedure, even though L suggested it to F and referred her to P, and the trial court properly relied on the unanimous expert testimony presented at trial that the physician who performs a procedure, and not the referring physician, has the duty to obtain the patient's informed consent to the procedure; moreover, the plaintiffs' reliance on the lay standard of informed consent, which relates to the extent or degree of disclosure a physician must make to fulfill his duty rather than whether a physician has a duty to inform, was misplaced because L did not have a duty to obtain F's informed consent in the first instance; furthermore, even if this court were to consider the colporrhaphy and the sling procedure to be a single procedure, the plaintiffs' claim would nonetheless fail because, when more than one physician provides care to a patient in relation to a particular medical condition, the patient must prove by expert testimony which physician, if any, owes the patient a duty to obtain informed consent, and all the experts testified at trial that it was the duty of P, not L, to obtain F's informed consent to the sling procedure.

2. The trial court properly rendered summary judgment for L and L's medical practice in connection with the plaintiffs' misrepresentation claims: this court recently held that an innocent misrepresentation claim is not viable in the context of a urogynecologist's provision of medical services because such claims generally are governed by § 552C of the Restatement (Second) of Torts, which requires that the misrepresenta-

Fajardo *v.* Boston Scientific Corp.

tion occur in a "sale, rental or exchange transaction with another," and the plaintiffs' innocent misrepresentation claim failed as a matter of law because the only medical services L provided to F, namely, recommending that F see a specialist and discussing the sling procedure, did not qualify as a sale, rental or exchange transaction; moreover, the plaintiffs' negligent and intentional misrepresentation claims also failed because L could not have negligently or intentionally misled, misinformed or misrepresented the quality, usefulness, risks or benefits of the Obtryx in light of the trial court's findings that L was unaware of what brand of sling P planned to implant in F and that L never discussed with F the Obtryx or any other products manufactured by B Co.

3. The plaintiffs could not prevail on their claim that the trial court improperly declined to instruct the jury on the reasonable alternative design prong of the risk-utility test:

a. This court assumed, without deciding, that the plaintiffs preserved their challenge to the trial court's jury instruction for purposes of this appeal because, even though the plaintiffs did not take exception to the instruction until after the jury was instructed and even though their e-mail request to charge the jury did not comply with the relevant rules of practice (§§ 16-21 and 16-23) insofar as it neither constituted a written request nor cited to any supporting evidence in the record, the trial court nonetheless determined that the plaintiffs timely requested a reasonable alternative design charge and addressed the claim on the merits.

b. In order to establish that they were entitled to an instruction on reasonable alternative design, the plaintiffs were required to present expert testimony regarding the alleged design defect of the Obtryx, whether an alternative design was technically and economically feasible, and whether the alternative would have reduced or avoided the risk of harm to F, as those issues involved complicated medical principles that were beyond the ken of the average juror; in the present case, the trial court determined, and the plaintiffs agreed, that R was the plaintiffs' product design expert, and, because the trial court correctly concluded that R was the only witness qualified to testify concerning reasonable alternative design, it properly focused on R's testimony in considering whether the plaintiffs had produced sufficient evidence to warrant such an instruction.

c. The plaintiffs failed to produce sufficient evidence that the class of retropubic slings consisting of TVTs constituted a reasonable alternative design to the Obtryx and that B Co.'s failure to use that alternative design rendered the Obtryx unreasonably dangerous: the plaintiffs' references to TVTs did not constitute identification of a reasonable alternative design, as the evidence demonstrated that the safety data related to TVT products, which can be made of many different types of mesh material with different pore sizes and weights that alter the performance of those products, varied considerably, and, to the extent that there was evidence regarding the safety data of TVTs, the studies the plaintiffs relied on

341 Conn. 535 FEBRUARY, 2022 539

Fajardo *v.* Boston Scientific Corp.

indicated merely that there were risks and complications with the use of TVT products, not that there was another product on the market that would have reduced the risk of harm to F in comparison to the Obtryx; moreover, some TVT products suffer from the same alleged defects as the Obtryx, namely, its heat seal and detanged edges, R testified that all transvaginal slings, including a specific TVT, made of polypropylene mesh are defective and unreasonably dangerous, regardless of whether they are heat-sealed or detanged, and the primary medical study on which the plaintiffs relied compared the Obtryx to a TVT manufactured by B Co., which was made of the same material and had the same heat seal as the Obtryx, and, therefore, did not support the plaintiffs' claim that there was a reasonable alternative design that would have reduced or avoided the risk of harm to F; furthermore, the plaintiffs did not point to a specific existing product and demonstrate that its use would have reduced or avoided the risk of harm to F but, rather, took a scattershot approach, pointing to different alternatives to the Obtryx, including surgical options, such as the Burch procedure, and the class of products known as TVTs, and that evidence did not demonstrate that any particular product was safer or would have reduced or avoided the risk of harm to F when compared to the Obtryx.

(*One justice concurring in part and dissenting in part*)

Argued April 27, 2020—officially released December 16, 2021*

*Procedural History*

Action to recover damages for, inter alia, personal injuries resulting from an allegedly defective product, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the Complex Litigation Docket, where the complaint was withdrawn as to the defendant Bridgeport Hospital; thereafter, the court, *Zemetis, J.*, granted the motions for summary judgment filed by the defendant Lee Jacobs et al. and rendered judgment thereon; subsequently, the case was tried to a jury before *Zemetis, J.*; verdict for the named defendant; thereafter, the court denied the plaintiffs' motion to set aside the verdict and rendered judgment in accordance with the verdict, from which the plaintiffs appealed. *Affirmed.*

* December 16, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Fajardo *v.* Boston Scientific Corp.

*Brenden P. Leydon* and *Jacqueline E. Fusco*, for the appellants (plaintiffs).

*Daniel B. Rogers*, pro hac vice, with whom were *Proloy K. Das*, *Jennifer M. DelMonico* and *Eric Anielak*, pro hac vice, for the appellee (named defendant).

*James F. Biondo*, with whom, on the brief, was *Diana M. Carlino*, for the appellees (defendant Lee Jacobs et al.).

*Opinion*

MULLINS, J. This appeal arises from an action in which the named plaintiff, Lesly Fajardo (Fajardo),[1] suffered injuries related to the implantation of a transvaginal mesh sling,[2] a medical device that is implanted in women to treat stress urinary incontinence.[3] In this action, the plaintiffs alleged that the named defendant, Boston Scientific Corporation (Boston Scientific), defectively designed its Obtryx Transobturator Mid-Urethral Sling System (Obtryx),[4] a polypropylene transvaginal mesh sling, and that the product injured her in various ways after Edward Paraiso, a nonparty urologist, implanted it in her. The plaintiffs claimed, as relevant to this appeal, that Boston Scientific's sale of the Obtryx violated the Connecticut Product Liability Act, General Statutes § 52-572m et seq.

[1] Fajardo's husband, Jairo Fajardo, is also a plaintiff. We need not separately address his derivative claims for loss of consortium, insofar as they rise or fall with Fajardo's claims.

[2] The terms "mesh sling," "tape," and "sling" are used interchangeably in this opinion.

[3] Stress urinary incontinence is defined as the "leakage of urine as a result of coughing, straining, or some sudden voluntary movement, due to incompetence of the sphincteric mechanisms." Stedman's Medical Dictionary (28th Ed. 2006) p. 962.

[4] The midurethral sling is a narrow strap made of synthetic mesh or native tissue that is placed under the urethra. It acts as a hammock to lift or to support the urethra and the neck of the bladder.

Fajardo *v.* Boston Scientific Corp.

The plaintiffs also brought, inter alia, claims of negligence sounding in informed consent and misrepresentation against Fajardo's gynecologist, the defendant Lee D. Jacobs, and Jacobs' medical practice, the defendant OB-GYN of Fairfield County, P.C. (medical defendants).[5] Their claims against the medical defendants rest on the theory that Jacobs, who referred Fajardo to Paraiso for a mesh sling implant, voluntarily assumed a duty to fully and accurately educate Fajardo as to the risks and benefits of, and the alternatives to, a mesh sling implant procedure. As to the misrepresentation claims, the plaintiffs alleged that Jacobs innocently, negligently and intentionally misled and misinformed Fajardo regarding the quality, usefulness, risks and/or benefits of the Obtryx.

Prior to trial, the trial court granted the medical defendants' motion for summary judgment, concluding, as a matter of law, that Jacobs, as a referring physician, had no duty to obtain Fajardo's informed consent for a procedure that Paraiso was to perform. The court also rendered summary judgment in favor of the medical defendants on the plaintiffs' misrepresentation claims. Thus, the case proceeded to trial only against Boston Scientific, and the jury returned a verdict in its favor. The plaintiffs moved to set aside the verdict, but the trial court denied that motion and rendered judgment in accordance with the jury's verdict. This appeal followed.[6]

On appeal, the plaintiffs claim that the trial court (1) incorrectly concluded that Jacobs did not owe a duty to procure Fajardo's informed consent to the sling procedure, (2) improperly rendered summary judgment in

[5] The plaintiffs withdrew their complaint against another defendant, Bridgeport Hospital.

[6] The plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Fajardo *v.* Boston Scientific Corp.

favor of the medical defendants on the plaintiffs' misrepresentation claims, and (3) improperly failed to instruct the jury that it could find Boston Scientific liable under the Connecticut Product Liability Act if Fajardo's injuries resulted from Boston Scientific's failure to adopt a reasonable alternative design that rendered the Obtryx unreasonably dangerous. We conclude that the trial court properly rendered summary judgment in favor of the medical defendants on the informed consent and misrepresentation claims and that it properly declined to instruct the jury on the reasonable alternative design prong of the risk-utility test. Accordingly, we affirm the judgment of the trial court.

I

CLAIMS AGAINST MEDICAL DEFENDANTS

A

Informed Consent Claim

The plaintiffs assert that the trial court improperly rendered summary judgment in favor of the medical defendants because it incorrectly concluded that Jacobs had not assumed a duty to obtain Fajardo's informed consent for implantation of the mesh sling and the sling procedure. Specifically, the plaintiffs argue that Jacobs assumed the duty by discussing and recommending the sling procedure to treat Fajardo's stress urinary incontinence. The plaintiffs also claim that Jacobs had a duty to obtain Fajardo's informed consent because Jacobs was involved in or maintained control over the surgical procedure performed by Paraiso. Neither claim has merit.

The following facts and procedural history are relevant to this claim. On March 26, 2010, Fajardo visited Jacobs, her gynecologist, for her annual preventative health examination. During that visit, Fajardo consulted

Fajardo *v.* Boston Scientific Corp.

with Jacobs about her gynecological and urological concerns. In his medical notes for this appointment, Jacobs noted that " '[the] patient complains of stress incontinence daily, very disruptive, she wants surgical repair.' "

After a physical examination, Jacobs diagnosed Fajardo with pelvic organ prolapse—a weakness in the vaginal wall that causes the bladder, colon, or rectum to herniate into the vagina. Specifically, Jacobs determined that Fajardo suffered from a grade 2 cystocele (prolapse of the bladder) and a grade 2 rectocele (prolapse of the posterior vaginal wall). Jacobs explained that a surgery to address the cystocele and rectocele probably would not rectify the incontinence issues. Consequently, given her interest in a more permanent fix to the incontinence issues, Jacobs discussed with Fajardo the option of "her see[ing] a urologist for an evaluation to see what could be offered to her [to address the incontinence]."

Also, during or as a result of this appointment, Jacobs wrote an office note, in which he stated that the " 'risks, benefits, and alternatives of sling/AP (anterior and posterior colporrhaphy)[7] discussed, all questions answered.' " (Footnote added; footnote omitted.) Then, as he had with numerous other similarly situated patients, he referred Fajardo to Paraiso, a urologist, for consultation and evaluation regarding her stress urinary incontinence.

On April 10, 2010, Fajardo consulted with Paraiso. He diagnosed her with stress urinary incontinence and recommended that she consent to having Paraiso surgically implant a midurethral mesh sling to treat it. Paraiso described the risks and benefits of, and alternatives to, the procedure. He then obtained Fajardo's "oral

---

[7] Colporrhaphy is surgical repair of the vaginal wall. An anterior colporrhaphy treats a cystocele or urethrocele (prolapse of the urethra into the vagina), whereas a posterior colporrhaphy treats a rectocele.

'informed consent' '' to proceed with surgical repairs to both her vaginal walls (a colporrhaphy performed by Jacobs) and urethra (a mesh sling implant performed by Paraiso).

Paraiso also discussed with Fajardo that both procedures would occur on the same day in a hospital surgical setting. Fajardo thereafter signed two separate consent forms, one for the A/P repair to be performed by Jacobs, and one for the sling procedure to be performed by Paraiso. Paraiso then communicated this plan to Jacobs.

On December 15, 2010, Fajardo signed Bridgeport Hospital's informed consent form, after having read and discussed it with Jacobs. Thereafter, Jacobs surgically repaired Fajardo's vaginal walls. Paraiso was not present during Jacobs' portion of the surgery. On the same day, immediately following Jacobs' procedure, Paraiso surgically implanted the Obtryx in Fajardo to address the stress urinary incontinence. Jacobs was not present during Paraiso's procedure. Jacobs also was not aware of the type of mesh sling Paraiso implanted into Fajardo. Furthermore, Paraiso is not associated with the medical defendants and is not a party to this action. The plaintiffs also do not allege that Jacobs had any vicarious liability for Paraiso's actions.

After these surgeries, Fajardo still experienced pain. Eventually, the sling had to be removed. As a result of her continued issues, and her belief that Jacobs had assumed a duty but failed to adequately inform her of the risks associated with the sling procedure, the plaintiffs brought claims against the medical defendants, alleging, inter alia, lack of informed consent, as well as intentional, negligent and innocent misrepresentation.

Before trial, the plaintiffs moved for summary judgment. They claimed that they were entitled to summary

Fajardo *v.* Boston Scientific Corp.

judgment in connection with their informed consent claim against Jacobs because Jacobs ''voluntarily assumed the duty to obtain informed consent from . . . Fajardo for implantation of the mesh sling and the mesh sling procedure when he recommended the sling procedure, informed her that it was mesh that would be permanently implanted into her to treat her stress urinary incontinence . . . [and that] it would fix her [stress urinary incontinence], and convinced her that it was safe.'' The plaintiffs argued that the undisputed facts supported their claim.

The medical defendants also filed a motion for summary judgment on the informed consent issue. In support of their motion, the medical defendants asserted that Jacobs was not obligated to obtain Fajardo's informed consent for implantation of the mesh sling and the sling procedure because he was not the physician who performed that procedure. The medical defendants relied on testimony from both their own and the plaintiffs' experts, who all agreed that it was Paraiso's duty—as the physician performing the surgery—to obtain Fajardo's informed consent for implantation of the mesh sling and the sling procedure.

Although the plaintiffs and the medical defendants gave slightly different accounts of the conversations that occurred during the March 26, 2010 appointment, both the plaintiffs and the medical defendants agreed that there were no disputed issues of material fact relevant to the informed consent claim. They agree that the issue for the trial court was whether, on the undisputed facts that Jacobs had discussed and recommended the sling procedure to Fajardo, as a matter of law, Jacobs was obligated to obtain Fajardo's informed consent.

The trial court denied the motion for summary judgment filed by the plaintiffs and granted the motion for summary judgment filed by the medical defendants. In

Fajardo *v.* Boston Scientific Corp.

doing so, the trial court explained: "[The plaintiffs urge] the court to impose a duty on Jacobs to obtain [Fajardo's] informed consent for Paraiso's implant of the [Boston Scientific] mesh because Jacobs 'assumed a duty' when, according to Jacobs' . . . office note [dated March 26, 2010], [he made the notation that] the 'risks, benefits, and alternatives of sling/AP surgery discussed, all questions answered.' The court rejects this request." (Footnote omitted.) In rejecting that request, the trial court relied on *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 465 A.2d 294 (1983), in which this court concluded that "[t]he principle that one who gratuitously undertakes a service [that] he has no duty to perform must act with reasonable care in completing the task assumed is not applicable to" a physician who discussed a procedure with a patient but then referred the patient to another physician to perform the surgery. Id., 305.

The trial court concluded that, in the present case, "Jacobs was a referring physician regarding the urological surgery performed by Paraiso. Jacobs is not alleged to have any vicarious liability for the conduct of Paraiso." The trial court further concluded that the duty to obtain informed consent "rests [with] the physician performing the procedure. The procedure is the mesh implant. Paraiso performed the implant. Paraiso, not Jacobs, had to obtain [Fajardo's] informed consent for the surgical implantation of the [Boston Scientific] mesh product."

On appeal, the plaintiffs assert that the trial court misapplied *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 305, in concluding that a physician can never assume a duty of obtaining informed consent. We read neither *Logan* nor the trial court's interpretation of that decision as concluding that a physician can never assume a such duty. Rather, as we explain herein, we agree with the medical defendants that, under the cir-

Fajardo *v.* Boston Scientific Corp.

cumstances of the present case and without expert testimony to the contrary, the physician conducting the vaginal mesh implantation surgery was responsible for obtaining Fajardo's informed consent.

We first set forth the applicable standard of review. "Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. . . . Finally, the scope of our review of the trial court's decision to grant the plaintiff's motion for summary judgment is plenary." (Internal quotation marks omitted.) *Dougan* v. *Sikorsky Aircraft Corp.*, 337 Conn. 27, 35, 251 A.3d 583 (2020).

We begin our analysis with a brief review of the law of informed consent. "The informed consent doctrine derives from the principle that [e]very human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent . . . commits an assault, for which he is liable in damages." (Internal quotation marks omitted.) *Sherwood* v. *Danbury Hospital*, 278 Conn. 163, 180, 896 A.2d 777 (2006). "The essential elements of a cause of action based [on] a lack of informed consent are [1] a breach of [2] duty by the defendant and [3] a causal connection between that breach and [4] the harm to

Fajardo *v.* Boston Scientific Corp.

the plaintiff.'' *Lambert* v. *Stovell*, 205 Conn. 1, 6, 529
A.2d 710 (1987). Only the second element, duty, is at
issue in the present appeal.

In the realm of informed consent, as throughout the
law of tort, ''[t]he existence of a duty is a question of
law and [o]nly if such a duty is found to exist does
the trier of fact then determine whether the defendant
violated that duty in the particular situation at hand.
. . . If the court determines, as a matter of law, that a
defendant owes no duty to a plaintiff, a verdict should
be directed [or summary judgment rendered] because
[i]t is merely reaching more speedily and directly a
result [that] would inevitably be reached in the end.''
(Citation omitted; internal quotation marks omitted.)
*Petriello* v. *Kalman*, 215 Conn. 377, 382–83, 576 A.2d
474 (1990).

Several of our informed consent cases have pre-
sented, in one form or another, the issue of whether a
physician or institution may owe a duty to obtain a
patient's informed consent to a procedure that is to be
performed by a third-party physician. In each case, this
court has concluded, as a matter of law, that the physi-
cian who performed the procedure was solely responsi-
ble for obtaining the patient's informed consent. See,
e.g., *Sherwood* v. *Danbury Hospital*, supra, 278 Conn.
171 n.8 (treating physician, rather than hospital, is
responsible for procuring patient's informed consent);
*Petriello* v. *Kalman*, supra, 215 Conn. 385 (''informed
consent . . . is the sole responsibility of the attending
physician to obtain''); *Logan* v. *Greenwich Hospital
Assn.*, supra, 191 Conn. 304–306 (internist who dis-
cussed kidney biopsy with patient and referred her to
urologist to obtain biopsy did not assume duty to pro-
cure patient's informed consent). The Appellate Court
has reached the same conclusion. See, e.g., *Torres* v.
*Carrese*, 149 Conn. App. 596, 622–23, 90 A.3d 256, cert.
denied, 312 Conn. 912, 93 A.3d 595 (2014); *Mason* v.

Fajardo *v.* Boston Scientific Corp.

*Walsh*, 26 Conn. App. 225, 230–31, 600 A.2d 326 (1991), cert. denied, 221 Conn. 909, 602 A.2d 9 (1992).

Those results are consistent with the rule, recognized by other jurisdictions and legal and medical authorities, that, when a physician refers a patient to a specialist for a consultation, it is the specialist—assuming that he ultimately performs the procedure at issue—who is solely responsible for educating the patient and obtaining her informed consent. See, e.g., *Brotherton* v. *United States*, Docket No. 2:17-CV-00098-JLQ, 2018 WL 3747802, *4 (E.D. Wn. August 7, 2018) ("the majority of jurisdictions that have addressed whether referring physicians have a duty to obtain a patient's informed consent have concluded that they do not" (internal quotation marks omitted)); 61 Am. Jur. 2d 314, Physicians, Surgeons, and Other Healers § 168 (2012) ("only the physician or health care provider who actually gives the treatment or performs the operation has a duty to inform the patient of the risks involved and [to] obtain the patient's informed consent").

As one federal court has explained, "[t]his makes common sense. The physician performing a procedure should advise on the risks of the procedure. When a primary care physician refers a matter to a specialist, it is not logical to impose a legal duty on the primary care physician to explain the risk of a procedure [that] the specialist may perform. Generally the reason for the referral to a specialist is because the specialist has more training, knowledge, or experience in the particular area of medicine." *Brotherton* v. *United States*, supra, 2018 WL 3747802, *5.

In Connecticut, *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 282, is the seminal case regarding the duty of a referring physician to obtain informed consent. In *Logan*, this court examined whether the plaintiff's internal medicine specialist (internist) had a

Fajardo *v.* Boston Scientific Corp.

duty to obtain the plaintiff's informed consent for a needle biopsy of her kidney that was performed by a different physician. See id., 304–306. The internist had informed the patient that she had lupus and recommended that she get a biopsy of her kidneys to determine to what extent the lupus had affected her kidneys. Id., 284–85. The internist explained that the procedure would involve the insertion of a needle into her back to obtain a specimen of kidney tissue. Id., 285. He further explained that it was a simple procedure in which local anesthesia would be used, that she may experience some bleeding and discomfort, and that she could leave the hospital in a day or two if there were no complications. Id.

The internist referred the plaintiff to Peter Bogdan, a urologist who would perform the operation, and told the patient that Bogdan would describe the details more fully. Id. Bogdan performed the needle biopsy and injured the plaintiff during the procedure. Id., 286–87. The plaintiff brought a claim of negligence against the internist for failure to obtain her informed consent. Id., 287. The trial court denied the internist's motion for a directed verdict, but the jury nonetheless returned a verdict in favor of the internist. The plaintiff appealed. Id., 284.

On appeal, this court concluded that the trial court should have granted the internist's motion for a directed verdict. In doing so, this court explained: "Although it is undisputed that [the internist] did discuss the kidney biopsy with the plaintiff and describe the procedure generally, there was no evidence that it was his duty to do so. In fact, the testimony indicated the contrary. The plaintiff's expert witness . . . testified that an internist . . . had no obligation to discuss the surgical procedure with the plaintiff or to obtain her informed consent. He stated unequivocally that those duties

341 Conn. 535 FEBRUARY, 2022 551

Fajardo *v.* Boston Scientific Corp.

rested [with] the physician who was to perform the operation.'' Id., 305.

In reaching this conclusion, this court expressly rejected the voluntary assumption of duty principle on which the plaintiffs rely in the present case. In *Logan*, the plaintiff claimed that the internist, by discussing the biopsy procedure with her, assumed and therefore owed a duty to the plaintiff to obtain her informed consent. Responding to this claim, this court clarified that ''[t]he principle that one who gratuitously undertakes a service [that] he has no duty to perform must act with reasonable care in completing the task assumed is not applicable to this situation. . . . Although [the internist] did describe the general nature of the operation to the plaintiff and some of the possible complications, he also told her that a more detailed explanation would be provided by Bogdan, the urologist. There is no evidence that his reliance [on] the operating surgeon to provide the information necessary for informed consent was contrary to normal medical practice or was unreasonable under these particular circumstances.'' (Citations omitted.) Id.

*Logan* is in line with the rule followed in most jurisdictions, which is that the physician conducting the surgery is the one who owes the duty of obtaining the patient's informed consent. This rule applies even under circumstances in which the referring physician discusses the surgical procedure with the patient and recommends that the patient undergo the procedure. *Logan* teaches that it is the physician who performs the actual procedure who is responsible for obtaining the informed consent to that procedure.

In the present case, Jacobs, Paraiso and the plaintiffs all agree that the implantation of the sling, performed by Paraiso, was a separate procedure from the repair to the vaginal wall performed by Jacobs. And Paraiso

Fajardo *v.* Boston Scientific Corp.

was solely responsible for performing the sling procedure. Thus, like the internist in *Logan*, notwithstanding the fact that Jacobs may have mentioned the sling procedure or even suggested that Fajardo may be a good candidate for the sling procedure, the fact remains that Jacobs referred her to Paraiso, the specialist, for further consultation. The plaintiffs presented no evidence to undermine the fact that Paraiso, as the physician who performed the sling procedure, was the physician responsible for obtaining Fajardo's informed consent.

In fact, here, as in *Logan*, even the plaintiffs' experts explained that the physician who performs the surgery is required to obtain a patient's informed consent, not the referring physician. Indeed, the plaintiffs' expert, Richard Bercik, a urologist, testified: "[T]he surgeon who is doing the procedure is responsible for the evaluation of the patient for that condition, the selection of how they're going to do the surgery, what they're going to do, and informing the patient. That's all [in] the hands of the person doing the procedure." The medical defendants' expert also agreed that it was the duty of the surgeon who performed the implantation procedure to obtain the patient's informed consent for that procedure and not the referring physician.

In rendering summary judgment, the trial court relied on the fact that "all disclosed medical experts agree [that] Paraiso, not Jacobs, had to obtain [Fajardo's] informed consent for the implant[ation] of the mesh product." We conclude that the trial court properly relied on the unanimous expert testimony to support its conclusion that Jacobs did not owe a duty to Fajardo to obtain her informed consent.

The plaintiffs also raise a similar but slightly different argument to support their claim that Jacobs had a duty to obtain Fajardo's informed consent to the sling procedure. In particular, they argue that, because Jacobs was

Fajardo *v.* Boston Scientific Corp.

Fajardo's gynecologist and she had established a high level of trust with him, she expected and trusted him to give her the information necessary for her to give informed consent. For support, they rely on the lay standard of informed consent adopted in *Logan.* They claim that the lay standard requires this court to determine whether a particular physician has a duty to obtain informed consent based on the patient's perspective of the interaction, instead of by relying on expert testimony regarding common practices in the medical community. We disagree.

In *Logan* v. *Greenwich Hospital Assn.*, supra, 191 Conn. 282, this court concluded that, in order to obtain informed consent from a patient, a physician must "provide the patient with that information [that] a reasonable patient would have found material for making a decision whether to embark [on] a contemplated course of therapy." Id., 292–93. This standard is referred to as the "lay standard of disclosure" because it focuses on what information a reasonable patient would want to know about a particular procedure in order to give his or her informed consent. Id.

We have made clear that "[o]ur standard of disclosure for informed consent in this state is an objective standard that does not vary from patient to patient based on what the patient asks or what the patient would do with the information if it were disclosed. . . . [T]he lay standard of informed consent requires a physician to provide the patient with that information [that] a reasonable patient would have found material for making a decision whether to embark [on] a contemplated course of therapy. . . . In adopting the objective lay standard, this court recognized that rather than impose on the physician an obligation to disclose at his peril whatever the particular patient might deem material to his choice, most courts have attempted to frame a less subjective measure of the physician's duty." (Citation

Fajardo *v.* Boston Scientific Corp.

omitted; emphasis omitted; internal quotation marks omitted.) *Duffy* v. *Flagg*, 279 Conn. 682, 692, 905 A.2d 15 (2006).

Contrary to the plaintiffs' assertion, the lay standard adopted in *Logan* does not speak to *whether* a physician has a duty to inform, but, rather, the standard governs how a physician who has a duty to obtain informed consent fulfills that duty. In other words, the lay standard applies only to the content of the disclosure that must be made. It is only once the duty to inform is established that the lay standard dictates how that duty must be satisfied. See *Mason* v. *Walsh*, supra, 26 Conn. App. 230 ("[o]nce the existence of the duty to inform has been established, the degree or extent of disclosure necessary to satisfy the duty must be proven in accordance with the lay standard"). If the physician does not have a duty in the first instance, the lay standard simply does not apply. Here, Jacobs never had the duty to obtain Fajardo's informed consent for the mesh implantation procedure. Thus, for purposes of determining whether Jacobs had a duty to inform at all, the lay standard does not inform that question.

Lastly, the plaintiffs claim that, because the two surgeries here took place on the same day and Jacobs maintained control over the procedures, he thus owed a duty to obtain Fajardo's informed consent. This claim is factually and legally meritless.

First, it is undisputed that the two surgeries were separate procedures, performed by different physicians with different training and specialties. Jacobs was not present when Paraiso performed the implantation procedure. Most important, it is undisputed that it was Paraiso, not Jacobs, who decided which vaginal mesh to implant in Fajardo, consistent with normal medical practice. The plaintiffs have failed to point to any evidence to support their claim that Jacobs retained con-

Fajardo *v.* Boston Scientific Corp.

trol over the implantation of the surgical mesh, which occurred during a different surgery. Thus, the fact that these distinct surgeries took place on the same day does not establish that Jacobs maintained control over the separate procedure performed by Paraiso. As a factual matter, then, this is not a scenario in which multiple physicians were performing or involved in a single surgical procedure.[8]

Second, even if we were to consider both surgeries as one surgical procedure, despite all of the evidence to the contrary, the plaintiffs' claim still fails because they provided no expert testimony to demonstrate that Jacobs had any duty to obtain Fajardo's informed consent. To be sure, this court has clarified that, when more than one physician provides care to the plaintiff, in relation to a particular medical condition, the plaintiff must prove by expert testimony which physician, if any, owes the plaintiff a duty to obtain informed consent. See *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 144, 757 A.2d 516 (2000), citing *Mason* v. *Walsh*, supra, 26 Conn. App. 230; see also *Mason* v. *Walsh*, supra, 230 ("[When] . . . a surgeon engages one or more specialists to perform a portion of a procedure, the issue as to who has the duty to obtain the patient's consent to that portion of the procedure to be performed by the specialist arises. It was incumbent [on] the plaintiff to establish by expert testimony *which of the physicians*, *if any*, owed him the duty of disclosing sufficient facts to permit him to exercise an informed consent to the use of general anesthesia." (Emphasis added.)).

---

[8] The plaintiffs cite to cases from other jurisdictions that have concluded that a referring physician owes a duty to obtain a patient's informed consent when the referring physician maintains control over the procedure performed. See, e.g., *O'Neal* v. *Hammer*, 87 Haw. 183, 187, 953 P.2d 561 (1998). Because we conclude that the plaintiffs did not produce sufficient evidence for the jury to conclude that Jacobs maintained control over Fajardo's vaginal mesh procedure, we need not address these cases from other jurisdictions.

Fajardo *v.* Boston Scientific Corp.

In the present case, even Bercik, the plaintiffs' expert, a urogynecologist and reconstructive surgeon, and professor of female pelvic medicine, agreed with Jacobs and Paraiso that, as a general matter, it is the consulting surgeon who is going to perform the procedure who is responsible for evaluating the patient, selecting the appropriate treatment, and educating the patient regarding that procedure. Frederick Rau, the medical defendants' expert, a board certified obstetrician and gynecologist, agreed that, under circumstances such as these, "[t]he referring physician has no medical duty or responsibility to obtain a patient's informed consent for a surgical procedure he/she is not going to perform. . . . [I]n this case . . . Jacobs acted entirely reasonably in discussing a potential sling procedure with [Fajardo], but he had no duty to obtain [her] informed consent for the ultimate sling procedure that was performed." Thus, not a single expert testified that Jacobs had a duty to obtain Fajardo's informed consent to the mesh implant.

Based on the foregoing, we conclude that the trial court properly rendered summary judgment in favor of the medical defendants in connection with the informed consent claim.

B

Misrepresentation Claims

The plaintiffs also claim on appeal that the trial court improperly rendered summary judgment in favor of the medical defendants on the claims of innocent, negligent, and intentional misrepresentation. We disagree.

First, this court recently concluded that a claim of innocent misrepresentation against a urogynecologic surgeon did not lie as a matter of law. See *Farrell* v. *Johnson & Johnson*, 335 Conn. 398, 421, 238 A.3d 698 (2020). In so concluding, this court explained that the

Fajardo *v.* Boston Scientific Corp.

surgeon's "provision of medical services did not qualify as a 'sale, rental or exchange transaction' under § 552C of the Restatement (Second) [of Torts], and, therefore, a claim for innocent misrepresentation does not lie under our existing innocent misrepresentation precedent." Id. Similarly, in the present case, Jacobs' provision of medical services, which involved only his recommendation that Fajardo see a specialist and discuss the sling procedure, does not qualify as a "sale, rental or exchange transaction . . . ." 3 Restatement (Second), Torts § 552C, p. 141 (1977). Therefore, the plaintiffs' claim of innocent misrepresentation fails as a matter of law.

Second, we agree with the trial court that the plaintiffs' claims of negligent and/or intentional misrepresentation also fail. The trial court found that "Jacobs was unaware of what kind of a sling Paraiso planned to implant in [Fajardo]." Indeed, the trial court also found that "the parties agree [that] Jacobs never discussed [Boston Scientific] products with [Fajardo]." Thus, because Jacobs did not know what product Paraiso would implant in Fajardo and never discussed Boston Scientific products with Fajardo, he could not have negligently or intentionally misled, misinformed or misrepresented the quality, usefulness, risks and benefits of the Obtryx.

Accordingly, we conclude that the trial court properly rendered summary judgment in favor of the medical defendants on the plaintiffs' misrepresentation claims.

II

INSTRUCTIONAL ERROR CLAIM AGAINST
BOSTON SCIENTIFIC

We next turn to the plaintiffs' claim that the trial court improperly declined to charge the jury on the reasonable alternative design prong of the risk-utility

Fajardo *v.* Boston Scientific Corp.

test. Specifically, the plaintiffs claim that they introduced sufficient evidence that the tension free vaginal tape (TVT)[9] was a safer reasonable alternative design to Boston Scientific's device, the Obtryx, which caused Fajardo's injuries. Boston Scientific contends that the plaintiffs' instructional error claim is unreviewable because it was not timely or properly preserved. Boston Scientific argues, in the alternative, that, if we conclude that the claim is reviewable, no such instruction was warranted in light of the evidence that was presented at trial and the governing law.

Even if we assume, for purposes of this appeal, that the request for a reasonable alternative design instruction was timely and properly made, we agree with the trial court that the evidence did not support such an instruction. Accordingly, we affirm the judgment of the trial court.

A

Legal Background

Before we turn to the parties' specific contentions, it is helpful briefly to situate the dispute within its broader legal context. In 2016, we decided a pair of cases that required us to reexamine and clarify the legal standards that govern claims brought under the Connecticut Product Liability Act. See *Bifolck* v. *Philip*

_____

[9] The record demonstrates that the term "TVT" is used both with respect to the Ethicon branded tension free vaginal tape (the specific TVT type product the plaintiff identified in her complaint) and as a generic term for similar tension free vaginal tapes in the class of TVT products, such as Boston Scientific's Advantage tape. Unless otherwise noted, we use the term in that broader, generic context. Although the plaintiffs juxtaposed the Obtryx to the class of TVT products generally, they did not focus on a particular TVT product with which to compare the Obtryx and, most important, did not demonstrate how another specific product without the alleged defects of the Obtryx would have avoided her injuries, a point we discuss in more detail subsequently in this opinion. See parts II C through E of this opinion.

Fajardo *v.* Boston Scientific Corp.

*Morris, Inc.*, 324 Conn. 402, 152 A.3d 1183 (2016); *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 136 A.3d 1232 (2016).

In *Izzarelli*, we sharply limited the scope of the traditional legal standard governing defective product design claims, the so-called "ordinary consumer expectation test," under which, "[t]o be considered unreasonably dangerous, the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (Internal quotation marks omitted.) *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 185. We clarified that that test "would be appropriate [only] when the incident causing injury is so bizarre or unusual that the jury would not need expert testimony to conclude that the product failed to meet the consumer's expectations." Id., 191. In other words, "[t]he ordinary consumer expectation test is reserved for cases in which the product failed to meet the ordinary consumer's minimum safety expectations, such as res ipsa [loquitur] type cases." (Emphasis omitted.) Id., 194.

In most product liability cases, by contrast, the plaintiff is required to establish a defective design under the modified consumer expectation test, pursuant to which "the jury would weigh the product's risks and utility and then inquire, in light of those factors, whether a reasonable consumer would consider the product design unreasonably dangerous." (Internal quotation marks omitted.) Id., 190; see id., 194. In applying that test, we indicated that the jury is to be instructed to consider a nonexclusive list of factors, one of which may be the availability of a feasible alternative design. See id., 190–91, 208–10.

In *Bifolck*, we further clarified *Izzarelli*'s ordinary and modified consumer expectation tests. First, we

Fajardo *v.* Boston Scientific Corp.

renamed them the "consumer expectation test" and the "risk-utility test," respectively. *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 432. Second, we set forth two distinct prongs or methods by which the latter test may be satisfied. "Under the risk-utility test, which will govern most cases, a product is in a defective condition unreasonably dangerous to the consumer or user if:

"(1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. In considering whether there is a reasonable alternative design, the jury must consider the feasibility of the alternative. Other relevant factors that a jury may consider include, but are not limited to, the ability of the alternative design to reduce the product's danger without unreasonably impairing its usefulness, longevity, maintenance, and esthetics, without unreasonably increasing cost, and without creating other equal or greater risks of danger [*Bifolck 1*]; or

"(2) The product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product [*Bifolck 2*]." Id., 434–35.

Here, the trial court declined to give an instruction under *Bifolck 1* and gave only a *Bifolck 2* instruction. The question in the present case is whether the trial court correctly concluded that the evidence did not support an instruction under the reasonable alternative design prong of the risk-utility test (i.e., *Bifolck 1*). We conclude that it did.

It is well established that, "[i]n determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed

Fajardo *v.* Boston Scientific Corp.

charge. . . . A request to charge [that] is relevant to the issues of [a] case and [that] is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence. . . . If . . . the evidence reasonably does not support a finding on the particular issue, the trial court is duty bound to refrain from submitting it to the jury.'' (Citation omitted; internal quotation marks omitted.) *Brown* v. *Robishaw*, 282 Conn. 628, 633, 922 A.2d 1086 (2007).

Whether the evidence presented by a party reasonably supports a particular request to charge ''is a question of law over which our review is plenary.'' Id. Similarly, whether there is a legal basis for the requested charge is a question of law also entitled to plenary review. See id., 633–34.

B

Reviewability of Plaintiffs' Instructional Claim

First, we must address Boston Scientific's assertion that the plaintiffs' claim is unreviewable because the plaintiffs failed to properly preserve their challenge regarding the instruction. Boston Scientific contends that the plaintiffs' *Bifolck 1* instruction claim is unpreserved because they did not submit a written request to charge on the instruction and also failed to cite evidence in the record to support such an instruction pursuant to Practice Book §§ 16-21 and 16-23. The following facts are necessary to address this contention.

Before the trial court charged the jury, the parties and the court had off-the-record discussions regarding *Bifolck 1*, the reasonable alternative design charge. Fol-

Fajardo *v.* Boston Scientific Corp.

lowing those discussions, the plaintiffs requested the charge through an e-mail to the court and did not cite to any evidence in the record to support the request.[10] However, the plaintiffs did not formally submit a written request for the court to charge the jury as to *Bifolck 1* pursuant to Practice Book §§ 16-21 and 16-23; nor did they take exception to the court's charge on the record before the jury was instructed.[11]

It was not until the jury had been charged and dismissed for the day that the plaintiffs formally took exception to the court's design defect instruction, claiming entitlement to an instruction on *Bifolck 1*. Although the plaintiffs' request did not technically comply with the requirements of Practice Book §§ 16-21 and 16-23, the trial court determined that the plaintiffs "did timely submit a request to charge on the 'reasonable alternative design' test . . . ." Ultimately, in response to the plaintiffs' motion to set aside the verdict, the trial court addressed the merits of the plaintiffs' claim and rejected it.

It is important to note that, in their e-mail request to the court, the plaintiffs did not cite to any evidence to support their request for a *Bifolck 1* charge. In failing to cite to any evidence in the request to charge, the plaintiffs failed to comply with Practice Book §§ 16-21 and 16-23. Accordingly, the trial court would have been

_____

[10] Counsel for the plaintiffs submitted the following request by e-mail: "In further response to [the defendants'] prior comments [the] [p]laintiffs contend that both consumer expectation and risk utility . . . of *Bifolck* are all applicable."

[11] The court charged the jury in relevant part: "The plaintiff[s] [claim] the Obtryx was defectively designed. In order to prove that a product was defective, the plaintiff[s] must prove the condition [they] claimed to be a defect made the product unreasonably dangerous. A product is in a defective condition unreasonably dangerous to the consumer or user if the design of the product [was] so manifestly unreasonable in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product."

Fajardo *v.* Boston Scientific Corp.

warranted in denying the plaintiffs' request on the basis that the plaintiffs did not cite to evidence to support it. See, e.g., *State* v. *Bettini*, 11 Conn. App. 684, 690, 528 A.2d 1180 ("[i]n the absence of compliance with the rules of practice, the trial court is entitled to deny a request to charge"), cert. denied, 205 Conn. 804, 531 A.2d 937 (1987); see also *State* v. *Kendall*, 123 Conn. App. 625, 672, 2 A.3d 990, cert. denied, 299 Conn. 902, 10 A.3d 521 (2010).

We point this out because it is this lack of specificity in the plaintiffs' request to charge that the concurrence and dissent capitalizes on and uses as an opportunity to recast and create its own arguments that, in its opinion, the plaintiffs should have made at trial to support their request for a reasonable alternative design instruction.

Nevertheless, despite the plaintiffs' failure to comply with Practice Book §§ 16-21 and 16-23, the trial court determined that the plaintiffs timely requested a *Bifolck 1* charge and addressed the request on the merits. Therefore, for the purposes of this appeal, we assume, without deciding, that the plaintiffs have preserved their challenge to the jury instruction.

C

Plaintiffs' Instructional Claim

The plaintiffs assert that the evidence presented at trial was sufficient to support the instruction, and, as a result, the trial court improperly declined to charge the jury on the reasonable alternative design prong of the risk-utility test. In support of their claim, the plaintiffs cite to a study introduced into evidence; see S. Ross et al., "Transobturator Tape Compared with Tension-Free Vaginal Tape for Stress Incontinence: A Randomized Controlled Trial," 114 Obstetrics & Gynecology 1287 (2009) (Ross study); the testimony of their

Fajardo *v.* Boston Scientific Corp.

product design expert, Bruce Rosenzweig, and other studies admitted into evidence.

Our decisions in *Bifolck* and *Izzarelli* establish the framework within which a plaintiff is entitled to a reasonable alternative design instruction under the risk-utility test. In *Bifolck*, this court explained: "In order to state a prima facie case that will permit the case to be submitted to the jury, the plaintiff must simply prove that the alternative design was feasible (technically and economically) and that the alternative would have reduced or avoided the harm." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 433. In *Izzarelli*, in which we addressed cigarette design, this court explained that, "[t]o establish the defect, the plaintiff's case required expert testimony on [product] design and manufacture, as well as the feasibility of an alternative design." *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, supra, 321 Conn. 203– 204.

At the outset, we must determine what type of evidence is sufficient to prove that an "alternative design was feasible (technically and economically) and that the alternative would have reduced or avoided the harm." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 433. Although we concluded in *Izzarelli* that expert testimony was required in that case, a question has arisen as to whether expert testimony is always required as a necessary component under the risk-utility test. This court has not addressed that specific question.

The issue has, however, received some attention in the federal courts. Indeed, as the United States District Court for the District of Connecticut has recognized, "[n]either *Izzarelli* nor *Bifolck* state[s] explicitly that expert testimony is required under the risk-utility test. However, both cases suggest it by juxtaposing the consumer expectation test, which does not require expert testimony, and the risk-utility test." *Frederick* v. *Deco*

Fajardo *v.* Boston Scientific Corp.

*Salon Furniture, Inc.*, Docket No. 3:16-cv-00060 (VLB), 2018 WL 2750319, *7 (D. Conn. March 27, 2018). Consistent therewith, the United States District Court for the District of Connecticut and the Second Circuit have applied the expert requirement to such claims.

For example, in deciding a motion for summary judgment for a defective design claim involving a water treatment pump, the United States District Court for the District of Connecticut concluded that "this is the type of complex case [that] requires an expert opinion as to defect and as to feasible alternative design." *Water Pollution Control Authority* v. *Flowserve US, Inc.*, Docket No. 3:14-cv-00549 (VLB), 2018 WL 1525709, *24 (D. Conn. March 28, 2018), aff'd, 782 Fed. Appx. 9 (2d Cir. 2019).

The court explained that, because the case involved the requirements of a pump for a wastewater treatment facility, the jury would not be "as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training." (Internal quotation marks omitted.) Id. The Second Circuit agreed with this analysis, explaining that, under Connecticut law, "[e]xpert evidence is necessary to satisfy the risk-utility test [when] the nexus between the injury and the alleged cause would not be obvious to the lay juror, because expert knowledge is often required in such circumstances to establish the causal connection between the accident and some item of physical or mental injury." (Internal quotation marks omitted.) *Water Pollution Control Authority* v. *Flowserve US, Inc.*, 782 Fed. Appx. 9, 14–15 (2d Cir. 2019).

This position is consistent with the majority of other jurisdictions. "[W]hen technical issues are involved (issues beyond common knowledge and experience) in a [product] liability or a [product related] case, expert

Fajardo *v.* Boston Scientific Corp.

testimony is required to generate a jury issue. . . . Technical issues requiring expert testimony include engineering, metallurgical and medical principles. . . . When such principles are at issue in a design defect case, expert testimony is necessary to establish a reasonable alternative design and the ability of such design to reduce the foreseeable harm of the challenged product—that is to say, expert testimony may be needed to establish the elements of breach and causation.'' (Citations omitted; internal quotation marks omitted.) *Farm Bureau Property & Casualty Ins. Co.* v. *CNH Industrial America, LLC*, Docket No. C16-3122-LTS, 2018 WL 2077727, *17 (N.D. Iowa February 5, 2018).

Other jurisdictions have explained that, ''[w]hen understanding the nature of the alleged defect requires knowledge . . . beyond that possessed by the average lay person . . . [the] law requires expert testimony to establish both the defect and the practical and technically feasible alternative design.'' (Internal quotation marks omitted.) *Buck* v. *Ford Motor Co.*, Docket No. 3:08CV998, 2012 WL 12887708, *3 (N.D. Ohio June 25, 2012), aff'd, 526 Fed. Appx. 603 (6th Cir. 2013); see, e.g., *Hilaire* v. *DeWalt Industrial Tool Co.*, 54 F. Supp. 3d 223, 252 (E.D.N.Y. 2014) (''New York law requires plaintiffs to use expert testimony as to the feasibility and efficacy of alternative designs in order to prove a design defect''). Indeed, in another product liability case involving vaginal mesh products, the United States District Court for the Southern District of Iowa explained that expert testimony was required on the issue of ''whether an alternative safer design existed for a medical device, which plainly involves medical principles.'' *Willet* v. *Johnson & Johnson*, 465 F. Supp. 3d 895, 905 (S.D. Iowa 2020).

Thus, as we have in other contexts, we conclude that expert testimony is required in a reasonable alternative design case when the evidence regarding the defect and

Fajardo *v.* Boston Scientific Corp.

whether the alternative was feasible (technically and economically) and whether the alternative would have reduced or avoided the risk of harm is beyond the ken of the average juror. See, e.g., *LePage* v. *Horne*, 262 Conn. 116, 125, 809 A.2d 505 (2002) ("[e]xpert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors" (emphasis omitted; internal quotation marks omitted)). In the present case, the evidence regarding whether there was an alternative design to the Obtryx that would have reduced or avoided the risk of harm to Fajardo involved complicated medical principles. These medical principles included the material from which the products were made, how the different products were placed in the body, how each worked to treat the condition of stress urinary incontinence, how the products interacted with the human body when implanted, and the risks and potential side effects. Accordingly, in order to prove that Boston Scientific's product was unreasonably dangerous under *Bifolck 1*, the plaintiffs were required to produce expert testimony on a reasonable alternative design.

Here, the trial court determined that Rosenzweig "was [the plaintiffs'] product design expert." The plaintiffs agree that he was their design expert. In fact, in their brief to this court, the plaintiffs focus on Rosenzweig and his testimony in other cases.[12] Therefore, in evaluating the plaintiffs' motion to set aside the verdict based on the failure of the trial court to give the *Bifolck 1* instruction, the trial court reviewed Rosenzweig's tes-

_____

[12] The plaintiffs do not rely on Bercik, whom the concurrence and dissent is forced to rely on to support its position. It is not surprising that the plaintiffs do not rely on Bercik because, as we explain subsequently in this opinion; see footnote 23 of this opinion and accompanying text; Bercik did not testify about the design of the Obtryx or its defects; he merely explained that he had implanted the Obtryx once or twice but usually implants the Ethicon branded TVT. He gave no opinion on whether use of the Ethicon branded TVT would have reduced or avoided the risk of harm to Fajardo.

Fajardo *v.* Boston Scientific Corp.

timony and the documentary evidence that came in through him.

The trial court determined: "While [Rosenzweig] was critical of several design characteristics of the Obtryx product, he offered no reasonable alternative design of a mesh product that was available to [Boston Scientific] when the Obtryx [implanted] in [Fajardo] was produced. The court rejects [the plaintiffs'] current suggestions [that] the jury might infer [that Rosenzweig] endorsed any polypropylene transvaginal mesh product, however designed or configured, as [Rosenzweig] . . . in this case . . . testified [that] transvaginal polypropylene implants are defective and unreasonably dangerous because transvaginal polypropylene mesh products provoke a foreign body rejection or reaction in women." Indeed, Rosenzweig testified that, in his opinion, all vaginal slings made of polypropylene mesh are defective. He specifically testified that a TVT produced by Gynecare, which is part of the Ethicon division of Johnson & Johnson (Ethicon branded TVT), is defective.

We agree with the trial court that Rosenzweig was the only witness qualified to opine on reasonable alternative design, and, therefore, the trial court properly focused on the testimony of Rosenzweig to determine whether the plaintiffs had produced sufficient evidence to warrant an instruction under the reasonable alternative design prong. We do the same and, as explained more fully in this opinion, conclude that the evidence was not sufficient to warrant an instruction on reasonable alternative design.[13]

---

[13] Although the ultimate determination of whether the facts supported the instruction is a legal question subject to plenary review, the facts underpinning that determination will not be overturned in the absence of a finding that they were clearly erroneous. In the present case, the trial court determined that Rosenzweig was the plaintiffs' product design expert, and the plaintiffs do not challenge that finding, let alone assert that it is clearly erroneous. The trial court further found that Rosenzweig's testimony was that all polypropylene mesh slings are defective and unreasonably dangerous

Fajardo *v.* Boston Scientific Corp.

D

Framing of the Issue Presented

In order to better understand the issue that is truly in dispute in this appeal, it is important to keep in mind that a plaintiff in Connecticut has two ways to establish that "a product is in a defective condition unreasonably dangerous to the consumer or user . . . ." *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 434. Those two ways are: "(1) A reasonable alternative design was available that would have avoided or reduced the risk of harm and the absence of that alternative design renders the product unreasonably dangerous. . . . [O]*r* (2) [t]he product is a manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product." (Emphasis added.) Id., 434–35. Therefore, in Connecticut, unlike in some states and in accordance with the position of the Restatement (Third) of Torts, Products Liability, proof of a reasonable alternative design is not necessary to prove that a product has a defective design. It is only one way of proving defective design.

In the present case, the jury was instructed under the second theory of liability, namely, that the risk of harm from the Obtryx so clearly exceeded its utility that a reasonable consumer would not purchase it. Accordingly, although the concurring and dissenting opinion spends considerable energy laying out how the plaintiffs demonstrated that the Obtryx was defective,

_____

and that the Burch procedure, which is a surgical repair, was his preferred method. The plaintiffs do not challenge these findings by the trial court as clearly erroneous, and the concurrence and dissent does not find them to be unsupported by the evidence. In fact, instead of addressing why the trial court's findings are clearly erroneous, the concurrence and dissent ignores them and engages in its own fact-finding. At no point did Rosenzweig opine that use of the Ethicon branded TVT or any other TVT product would have reduced or avoided Fajardo's injuries.

Fajardo *v.* Boston Scientific Corp.

it is important to remember that the jury considered whether the product was defective insofar that it was a "manifestly unreasonable design in that the risk of harm so clearly exceeds the product's utility . . . ." Id., 435. Indeed, the jury was able to consider all of the evidence presented and ultimately found that the Obtryx was not defective under *Bifolck 2*.

The issue on appeal is not whether the jury should have been able to consider the plaintiffs' claims at all. Instead, the question is whether the plaintiffs introduced sufficient evidence that the Obtryx is defective because a reasonable alternative design was available that would have reduced or avoided the risk of harm to Fajardo and Boston Scientific's failure to adopt that reasonable alternative design rendered the Obtryx unreasonably dangerous. In considering the plaintiffs' claim and the position of the concurrence and dissent, it is important to remember that "a manufacturer is not required to design the safest possible product or a safer product than the one it designed, so long as the design adopted was reasonably safe. The duty assumed by the manufacturer is to design the product for its intended use, namely, that use which could reasonably be foreseen. Stated differently, a manufacturer has a duty to avoid placing on the market a product [that], because of its defective design, presents an unreasonable risk of harm to others." (Footnotes omitted.) 6 S. Speiser et al., American Law of Torts (2010) § 18:73, pp. 180–81.

Accordingly, in considering the plaintiffs' claim, the issue is not whether the plaintiffs have produced sufficient evidence that the Obtryx had defects and that some of those defects may have caused Fajardo's injuries, which is the claim under *Bifolck 2* that the jury considered and rejected. Rather, the issue presented by this appeal is whether the plaintiffs introduced sufficient evidence that there was a reasonable alternative design available to Boston Scientific's Obtryx and that

Fajardo *v.* Boston Scientific Corp.

Boston Scientific's failure to use that alternative design rendered the Obtryx unreasonably dangerous.

E

Whether an Instruction on a Reasonable Alternative Design Was Warranted

On appeal, the plaintiffs assert that Rosenzweig's testimony, the Ross study, and other studies introduced into evidence established a reasonable alternative design to the Obtryx, namely, the TVT. To the extent that the plaintiffs assert that they presented sufficient evidence that the TVT is a reasonable alternative design to the Obtryx, it appears—from the evidence on which they rely—that they must be referring to the class of tension free vaginal tape that is implanted in a retropubic fashion.[14] First, Rosenzweig does not compare the Obtryx

---

[14] The concurrence and dissent asserts that it is an "erroneous assumption" that, to the extent that the plaintiffs referred to the TVT, it was the class of retropubic slings rather than the Ethicon branded TVT. Part III A of the concurring and dissenting opinion. That claim is belied by the record. Indeed, a review of the plaintiffs' memorandum in support of their motion for a new trial reveals that the plaintiffs never once identified the Ethicon branded TVT as the reasonable alternative design for which they had presented sufficient evidence to support a charge. Instead, in their memorandum in support of the motion, the plaintiffs cited to "safer alternatives" to the Obtryx, including the Burch procedure. Even in their brief to this court, the plaintiffs again referred to "safer alternatives" and the Burch procedure, and, for the first time, mentioned "TVT" as one of the safer alternatives without indicating whether it was the Ethicon branded TVT.

Furthermore, Boston Scientific's brief to this court demonstrates that it also understood the plaintiffs to be claiming that the class of TVTs was a reasonable alternative design. Boston Scientific argues specifically in its brief: "Without naming a specific product, the plaintiffs argue that other polypropylene slings, presumably without detanged portions, are reasonable alternative designs to the Obtryx." Boston Scientific further asserted that "the plaintiffs never identified at trial any specific alternative design [that] they claim [Boston Scientific] should have used with the Obtryx." (Emphasis omitted.) Boston Scientific also explained that "[t]he plaintiffs' posttrial reliance on a single clinical study for the proposition that other polypropylene slings constitute reasonable alternative designs is inconsistent with the evidence presented by the plaintiffs at trial."

Fajardo *v.* Boston Scientific Corp.

to the Ethicon branded TVT. Second, the Ross study did not compare the Obtryx to the Ethicon branded TVT but compared the Obtryx to another retropubic sling manufactured by Boston Scientific. Third, the other studies entered into evidence did not compare the Obtryx device to the Ethicon branded TVT.[15] Finally, despite the efforts of the concurrence and dissent; see part III A 1 and footnote 22 of the concurring and dissenting opinion; Bercik did not compare the Ethicon branded TVT to the Obtryx; he notes only that he and a few other physicians with whom he works prefer the Ethicon branded TVT to other slings but that one of his superiors in his working group at Yale School of Medicine still uses the Obtryx.[16]

[15] Although the Moalli study compared the tensile property of the mesh used in five other devices (including the mesh used in the Obtryx) to the mesh used in the Ethicon branded TVT, it did not compare how the Obtryx performed in the human body to how the Ethicon branded TVT performed in the human body; nor did it compare the risks of harm from the two devices. See P. Moalli et al., "Tensile Properties of Five Commonly Used Mid-Urethral Slings Relative to the TVT," 19 International Urogynecology J. 655, 663 (2008) ("Although it is important to understand the behavior of a sling before implantation, the behavior of these slings in vivo and after incorporation into host tissue may be inferred, but is not directly apparent from these studies. Indeed, the next logical step to the current study is the implementation of rigorous in vivo studies to determine how the textile and tensile properties of polypropylene slings relate to tissue behavior, efficacy, patient morbidity, and patient satisfaction.").

[16] The concurrence and dissent asserts that Bercik "testified that Fajardo could have been a candidate for the TVT, that the Obtryx was the cause of her injuries, and that he had begun using the TVT in favor of transobturator slings, including the Obtryx, because of his negative experience with the latter." Footnote 17 of the concurring and dissenting opinion. Bercik actually testified that, at the time Farjado came to see him in 2014 when she was experiencing pain from the Obtryx, he recommended that she could potentially benefit from the TVT. Bercik explained that he recommended the TVT at that time because the transobturator sling procedure had not worked, so he would not try that again. This clearly is not testimony suggesting that the TVT was safer or a more reasonable alternative and should have been used in 2010 when Fajardo had the Obtryx implanted, as the concurrence and dissent suggests.

Similarly, Brian Hines, a urogynecologist who did not testify at the trial in the present case, also saw Fajardo after she was having pain from the

Fajardo *v.* Boston Scientific Corp.

The class of TVTs cannot, however, be a reasonable alternative design that would have reduced or avoided the risk of harm to Fajardo. Specifically, the evidence in the record demonstrates that products that belong to the class of TVTs can be made of many different types of mesh material of various pore sizes and differing weights and that those design differences can alter performance and safety. Therefore, the plaintiffs' repeated reference to TVT does not constitute identification of a reasonable alternative design when the safety data related to that class of products vary considerably. By referring to the class of TVTs when some products within that class suffer from the same alleged defects as the Obtryx—a point we will elaborate on shortly—the plaintiffs failed to produce sufficient evidence of a reasonable alternative design that would have reduced or avoided the risk of harm to Fajardo.

A review of Rosenzweig's testimony reveals that he testified regarding defects in the Obtryx. First, he explained that, in his opinion, all slings made with polypropylene mesh are defective. Rosenzweig explained that the use of that type of mesh caused a foreign body reaction in Fajardo and contributed to the cause of her injuries. The Obtryx is made of polypropolyene mesh, but so, too, is the Ethicon TVT.

Obtryx. A review of his notes from that appointment, which were an exhibit at the trial, reveals that Hines suggested the TVT as an option for Fajardo *after* she had already tried the Obtryx, but he also notified her that it had many of the same risks of injury that she experienced with the Obtryx and that further testing was required to determine if she would be a good candidate for this procedure. Again, Hines did not opine on whether the TVT should have been used at the time of Fajardo's original surgery, only that, after she already had issues with the Obtryx, the TVT could possibly be an alternative. Accordingly, we disagree with the concurrence and dissent that "[t]his evidence would have permitted the jury to conclude not only that the TVT is, in general, a viable alternative to the Obtryx . . . but also that it was well suited to Fajardo's individual needs." Part II A 1 of the concurring and dissenting opinion.

Fajardo *v.* Boston Scientific Corp.

Second, Rosenzweig testified that the mesh used in the Obtryx had a detanged or heat-sealed edge and that it made the mesh stiffer in the area that had been sealed. Rosenzweig explained: "When you seal the edge of the mesh, you increase the stiffness of the mesh. . . . But, what scientists have shown is that stiffness of mesh is a bad property. It increases the foreign body reaction . . . the inflammatory reaction, the amount of scarring, and all the sequelae that we're going to continue to talk about . . . ." Rosenzweig was later asked: "Earlier, you described some problems with the detanging or the heat sealing of the center portion of the . . . Obtryx sling. Does that detanging add any benefit that would outweigh the added risks . . . from the stiffness?" Rosenzweig responded, "[n]o."[17]

To the extent that the plaintiffs are claiming that the class of TVTs is a reasonable alternative design that would have reduced or avoided the risk of harm to Fajardo, this testimony does not support the plaintiffs' claims. First, there was evidence that other products within the class of TVTs are made of the exact same mesh as the Obtryx, and those products have the same heat seal and detanging. Rosenzweig testified that the Advantage sling has the "same heat-sealed center." The plaintiffs did not demonstrate how a TVT product with the same allegedly defective material and heat sealing as the Obtryx would have reduced or avoided the risk of harm to Fajardo. Second, even if the plaintiffs established that other TVTs do not have the heat seal and detanging, that does not prove that the use of that other product would have reduced or avoided the risk of harm to Fajardo. In fact, the plaintiffs' product design expert testified that all vaginal slings made of polypro-

_____

[17] Rosenzweig never testified that a particular TVT would have been a reasonable alternative design. At most, Rosenzweig testified that "the data [are] limited but [show] that . . . for [the] Obtryx and the Advantage mesh . . . it's inferior to the other slings that are on the market."

Fajardo *v.* Boston Scientific Corp.

pylene mesh are defective and unreasonably dangerous.
Even more to the point, Rosenzweig admitted that he
considered the Ethicon branded TVT defective for
that reason.

Nevertheless, the plaintiffs also rely heavily on the
Ross study in support of their claim that the class of
products known as TVTs is a reasonable alternative
design to the Obtryx. It cannot be emphasized enough
that the Ross study does not address the Ethicon
branded TVT at all. Instead, it compared two products
made by Boston Scientific—the Obtryx and the Advan-
tage branded TVT. See S. Ross et al., supra, 114 Obstet-
rics & Gynecology 1288. Therefore, the plaintiffs'
reliance on that study undermines the claim of the con-
currence and dissent that the plaintiffs pointed to the
Ethicon branded TVT as a reasonable alternative
design.

Furthermore, the Ross study does not even support
the plaintiffs' claim that the class of TVTs was a reason-
able alternative design to the Obtryx that would have
reduced or avoided the risk of harm to Fajardo. Specifi-
cally, there was evidence at trial that the Obtryx and
the Advantage branded TVT are made of the exact same
mesh material. In explaining the Ross study, Rosenz-
weig stated: "This is a study that was done and pub-
lished in 2009. It's a randomized control trial comparing
the Obtryx sling made of Advantage mesh with the
Advantage sling that goes behind the pubic bone, also
made of Advantage mesh." Rosenzweig also testified
that the Advantage sling is made of the exact same
material as the Obtryx, including the heat seal. Because
Rosenzweig identified the heat seal in the mesh that is
used in the Obtryx as one of the primary defects that
caused Fajardo's injury, a study that compared two
products made of the same mesh with the same heat
seal does not support the plaintiffs' claim that there

Fajardo *v.* Boston Scientific Corp.

was a reasonable alternative design that would have reduced or avoided the risk of harm to Fajardo.

The only difference between the two devices compared in the Ross study was their placement in the body. The Advantage sling was designed to be placed in a retropubic fashion, meaning behind the pubic bone. The Obtryx, on the other hand, was designed to be placed using a transobturator approach. See S. Ross et al., supra, 114 Obstetrics & Gynecology 1287. Rosenzweig did not testify that the risk of harm to Fajardo would have been reduced or avoided if a retropubic sling was used. Instead, Rosenzweig identified only the polypropylene mesh and the heat seal as the defects that caused Fajardo's injuries. Accordingly, contrary to the plaintiffs' position, the Ross study did not support their request for a reasonable alternative design instruction.

Furthermore, even if the plaintiffs were able to make a claim of reasonable alternative design by pointing to a class of products, it is important to note that Rosenzweig testified that, in his opinion, *all* mesh products fabricated from polypropylene, including the Ethicon branded TVT, as well as other products within the class of TVTs, are unsafe and unsuitable for implantation in the human body. Rosenzweig's testimony was that any vaginal sling made of polypropylene mesh is defective and not reasonably safe, and that the Burch procedure, a surgical option, was the best approach to treat stress urinary incontinence.[18]

---

[18] To the extent that the plaintiffs' claim may be understood to be that the surgical procedure testified to by Rosenzweig constitutes a reasonable alternative design, we agree with the courts that have considered this issue and concluded that a surgery is not a reasonable alternative design to a particular product. See, e.g., *Mullins* v. *Johnson & Johnson*, 236 F. Supp. 3d 940, 943 (S.D. W. Va. 2017) ("[e]vidence that a surgical procedure should have been used in place of a device is not an alternative, feasible design in relation to the TVT").

Fajardo *v.* Boston Scientific Corp.

As the Fifth Circuit has explained, "[a] design is not a safer alternative if, under other circumstances, [it would] impose an equal or greater risk of harm than the design at issue. . . . Similarly, the plaintiff must show the safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety." (Citation omitted; emphasis omitted.) *Casey* v. *Toyota Motor Engineering & Mfg. North America, Inc.*, 770 F.3d 322, 331 (5th Cir. 2014). Accordingly, we cannot conclude that the plaintiffs produced sufficient evidence to warrant an instruction that the class of TVTs constitutes a reasonable alternative design.

We agree with the concurrence and dissent that pointing to an existing product that has been successfully commercialized can serve as evidence of the feasibility of an alternative design; see part II A 1 of the concurring and dissenting opinion; but we simply find that proposition inapplicable to the present case.

To put it simply, that is just not the way that the plaintiffs tried this case. The plaintiffs did not produce sufficient facts to support a reasonable alternative design claim. Namely, the plaintiffs did not point to a specific existing product on the market and demonstrate that its use would have reduced or avoided the risk of harm to Fajardo. At best, the plaintiffs took a scattershot approach, pointing to different alternatives to the Obtryx that included surgical options and a class of products known as TVTs. Specifically, the plaintiffs' product design expert recommended a surgical alternative known as the Burch procedure, the Ross study compared the Obtryx to an entirely different product, the Advantage tape, another study compared transobturator slings like the Obtryx to retropubic slings (the class of products known as the TVT), and another study compared mesh used in products within the class of TVTs to the mesh used in the Ethicon branded TVT.

Fajardo *v.* Boston Scientific Corp.

The evidence did not, however, demonstrate that any particular product was safer or, most important, would have reduced or avoided the risk of harm to Fajardo when compared to the Obtryx.

We recognize that the commentary to the Restatement (Third) provides that "other products already available on the market may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as reasonable alternatives to the product in question." Restatement (Third), Torts, Products Liability § 2, comment (f), p. 24 (1998); see part II A 1 of the concurring and dissenting opinion. This court, however, has not adopted the Restatement (Third). See *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 431 ("the defendant's arguments have not persuaded us that we should adopt the Restatement (Third) at this time").

Although we have not expressly adopted the Restatement (Third), it does inform our analysis in the present case. Even if this court had adopted the Restatement (Third), and if we agreed with the concurrence and dissent that the plaintiffs pointed to a single product on the market as a reasonable alternative— namely, the Ethicon branded TVT—pointing to a product on the market alone would not have satisfied the plaintiffs' burden in this case. Although pointing to a product on the market with an alternative design may demonstrate that the alternative design is feasible, it does not by itself establish that the alternative design would have reduced or avoided the harm to Fajardo. See, e.g., *Bic Pen Corp.* v. *Carter*, 171 S.W.3d 657, 671–72 (Tex. App. 2005) (not requiring expert testimony based on counsel's concession but reviewing safety data introduced into evidence to determine whether products on market were reasonable alternative design that would have avoided injury), rev'd on other grounds, 251 S.W.3d 500 (Tex. 2008). The plaintiffs still needed to produce

Fajardo *v.* Boston Scientific Corp.

sufficient evidence to demonstrate that, if Boston Scientific had adopted the design of the Ethicon branded TVT, it would have reduced or avoided the risk of harm to Fajardo.

To the extent that there was information regarding the safety data of the TVT, that evidence was that there were risks and complications with the use of the TVT. For example, one study explained that "one of the primary problems in using the TVT is that as a result of its low stiffness, the mesh easily deforms when tensioning under the urethra. Specifically, pulling the sling gently results in thinning of the mesh (permanent deformation) and fraying at the tanged edges. Consequently, various companies have modified polypropylene sling meshes for easier placement by heat sealing the midportion of the sling that lays under the urethra . . . ." P. Moalli et al., "Tensile Properties of Five Commonly Used Mid-Urethral Slings Relative to the TVT," 19 International Urogynecology J. 655, 656 (2008) (Moalli study). Another study explained the complications from the TVT to "include bladder perforation, excessive blood loss, urinary retention, pelvic hematoma, and suprapubic wound infection. Later complications include exacerbation of existing or development of de novo overactive bladder, persistent suprapubic discomfort, and vaginal mesh erosion. Rare complications, such as bowel injuries and female sexual dysfunction, have been reported." H. Cholhan et al., "Dyspareunia Associated with Paraurethral Banding in the Transobturator Sling," 202 Am. J. Obstetrics & Gynecology 481.e1, 481.e1 (2010) (Cholhan study). The authors of the Ross study also explained that "the most common perioperative complications associated with TVT were bladder perforation and bleeding"; S. Ross et al., supra, 114 Obstetrics & Gynecology 1291; and that "[c]oncern about complications associated with TVT led in 2001 to the development of another minimally invasive pro-

Fajardo *v.* Boston Scientific Corp.

cedure using the transobturator tape.'' (Footnotes omitted.) Id., 1287–88.[19] Contrary to the assertions of the concurrence and dissent; see part II A 2 of the concurring and dissenting opinion; we do not conclude that the plaintiffs had to point to a risk free product on the market to allow the jury to find that there was a reasonable alternative design for the Obtryx. Nevertheless, the plaintiffs did have to produce evidence that the other product on the market would have reduced the risk of harm to Fajardo.

Furthermore, because this case involves complex medical devices with complicated medical risks and injuries, evidence comparing their relative safety data would have had to come from an expert qualified to testify regarding the designs of the Ethicon branded TVT and the Obtryx, and qualified to explain how use of the Ethicon branded TVT would have reduced or avoided the risk of harm to Fajardo.[20] In discussing

[19] The authors of the Ross study also explained that ''[t]wo systematic reviews have examined the evidence on effectiveness of transobturator tape compared with TVT, without finding clear differences in outcome. Objective cure [rates] after transobturator tape ranged from 84 [percent] to 98 [percent]; for TVT it ranged from 86 [percent] to 99 [percent]. The objective cure rates in [the Ross] study (81 [percent] for transobturator tape, 77 [percent] for TVT) appear lower than those previously reported, but the difference is likely because [the Ross study's] follow-up and definition of objective cure was very rigorous.'' S. Ross et al., supra, 114 Obstetrics & Gynecology 1291.

[20] In the present case, the concurrence and dissent asserts that the plaintiffs produced sufficient evidence for the jury to consider their claim that the Ethicon branded TVT was a reasonable alternative design to the Obtryx. The basic premise underlying that position is that the evidence at trial established that the Ethicon branded TVT is the ''gold standard'' to treat stress urinary incontinence, that the Obtryx differed from the Ethicon branded TVT in three ways, and that those three design differences rendered the Obtryx unreasonably dangerous. We disagree with the position of the concurrence and dissent in three fundamental ways.

First, despite the repeated protestations of the concurrence and dissent, the evidence in the record did not establish that the Ethicon branded TVT is the ''gold standard'' to treat stress urinary incontinence. See, e.g., part II A 1 of the concurring and dissenting opinion. To the contrary, the one product design expert who testified at trial testified that a surgical procedure,

341 Conn. 535    FEBRUARY, 2022    581

Fajardo *v.* Boston Scientific Corp.

whether expert testimony was required for a reasonable

not the Ethicon branded TVT, was the best method to treat stress urinary incontinence. The product design expert also testified that all products made of polypropylene mesh are defective, including the Ethicon branded TVT. Furthermore, as we discuss subsequently in this opinion, there was evidence in the studies introduced at trial that, although the Ethicon branded TVT may have been the first such product on the market, it had several deficiencies that caused manufacturers to create alternatives. What the plaintiffs' expert never did was testify that the design of the Ethicon branded TVT would have entailed less risk of harm to Fajardo and, thus, would not have caused greater or equal injury. At best, the plaintiffs' expert testified that the Obtryx had three alleged defects, but we do not learn from Rosenzweig or any other expert how or whether the Ethicon branded TVT would have reduced or avoided the risk of harm to Fajardo.

Second, the concurrence and dissent acknowledges that the one product design expert who testified did not identify the Ethicon branded TVT as a reasonable alternative design to the Obtryx. Nevertheless, while acknowledging that expert testimony on reasonable alternative design is required in this case, the concurrence and dissent asserts that any evidence that the product design expert did not provide is supplemented by other evidence in the case, including circumstantial evidence. We disagree.

The question of whether there was a reasonable alternative design available for the Obtryx involved complex medical principles, and the jury needed qualified expert testimony about each element of the prima facie case of reasonable alternative design. Courts have repeatedly explained that "[a]ny decision [that] pertains to the design of the device involves engineering, metallurgical and medical principles beyond common knowledge and experience. Whether the device had a design defect, whether the foreseeable risks of harm the device posed could have been reduced or avoided by the adoption of a reasonable alternative design and whether the omission of such design rendered the device not reasonably safe are technical, scientific issues that cannot be fully understood by the average juror without some expert assistance." *Benedict* v. *Zimmer, Inc.*, 405 F. Supp. 2d 1026, 1033 (N.D. Iowa 2005); see also *Neilson* v. *Whirlpool Corp.*, Docket No. 3:10-cv-00140-JAJ-RAW, 2012 WL 13018693, *11 (S.D. Iowa January 3, 2012) ("An average juror has no understanding as to the actual design of the Whirlpool washer or any alternative designs [that] might reduce the risk of foreseeable harm. This is the exact type of case in which a 'jury needs assistance to reach an intelligent or correct decision. . . . Design defect cases sometimes involve technical, scientific issues [that] cannot be fully understood by the average juror without some expert assistance.' "). If we adopt the position of the concurrence and dissent and allow other nonexpert testimony to fill in gaps left by the qualified expert in this type of case, the jury does not have the assistance necessary to reach an intelligent or correct decision.

Third, although the Obtryx may have differed from the Ethicon branded TVT in three ways, evidence of these different design elements is not enough.

Fajardo *v.* Boston Scientific Corp.

alternative design in another case involving a pelvic mesh product, the United States District Court for the Southern District of Iowa explained: "Whether expert testimony is required ultimately depends on whether it is a fact issue [on] which the jury needs assistance to reach an intelligent or correct decision. . . . Although Iowa law does not appear to require expert testimony for recovery in a [product] liability action, the plaintiff must supply sufficient evidence to satisfy the trial court that the jury, with its common knowledge, could reasonably find an alternative design to be practicable and feasible. . . . Technical issues requiring expert testimony include engineering, metallurgical and medical principles. . . . When such principles are at issue in a design defect case, expert testimony is necessary to establish a reasonable alternative design and the ability of such design to reduce the foreseeable harm of the challenged product—that is to say, expert testimony may be needed to establish the elements of breach and causation. . . . Also, [e]xpert testimony regarding reasonable alternative designs is subject to the same standard as any other expert testimony. . . . *Here, the issue is whether an alternative safer design existed for a medical device, which plainly involves medical principles. . . . Indeed, this is a case well outside the common experience of jurors, such as a stuffed toy with hard plastic buttons, because it involves more technical and scientific issues.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Willet* v. *Johnson & Johnson,* supra, 465 F. Supp. 3d

The plaintiffs needed to prove, through expert testimony, that use of the Ethicon branded TVT would have reduced or avoided the risk of harm to Fajardo. There simply was not sufficient evidence on this point. To the contrary, Rosenzweig testified that Fajardo suffered from a chronic foreign body reaction, that use of polypropylene mesh can cause a foreign body reaction, and that both the Ethicon branded TVT and the Obtryx were made of polypropylene mesh. Accordingly, the plaintiffs did not produce sufficient evidence to support an instruction under *Bifolck 1*.

Fajardo *v.* Boston Scientific Corp.

905. We conclude that, under Connecticut law, the issue of whether one particular vaginal mesh sling on the market would reduce or avoid the risk of harm is an issue on which the jury needed assistance to reach an intelligent decision.[21] Therefore, we agree with the trial court that the plaintiffs' failure to produce such expert

---

[21] There was evidence introduced in the present case that the transobturator approach was as effective and reduced or avoided some risk of injuries to patients. For example, the authors of the Petri study explained that "numerous different types of transobturator slings like inside-out tapes and thermally annealed non-knitted, non-interwoven polypropylene tape (Obtape) were developed and tested in clinical trials. In terms of efficacy, both retropubic and transobturator tapes are found to have similar subjective and objective cure rates . . . . Only one meta-analysis showed that the occurrence of bladder perforations, pelvic hematoma, and storage lower urinary tract symptoms was significantly less common in patients treated by transobturator tapes . . . ." (Citations omitted.) E. Petri & K. Ashok, "Comparison of Late Complications of Retropubic and Transobturator Slings in Stress Urinary Incontinence," 23 International Urogynecology J. 321, 321 (2012); see id., 324 (concluding that obstructive complications seen more commonly in retropubic tapes as compared to transobturator tapes were more frequently associated with persistent pain, dyspareunia, and tape related infections). Other studies introduced at trial explained that "[p]otential advantages of the transobturator approach include fewer bladder and bowel injuries and less voiding dysfunction and urinary retention than with traditional sling procedures." P. Rosenblatt & S. Pulliam, "Update on Suburethral Slings for Stress Urinary Incontinence," Contemporary OB/GYN, April 15, 2004, available at https://www.contemporaryobgyn.net/view/update-suburethral-slings-stress-urinary-incontinence (last visited December 10, 2021). Another study concluded that, "[i]n short-term follow-up there was no obvious difference between [retropubic] and [transobturator] routes in terms of safety and efficacy." T. Tarcan et al., "Safety and Efficacy of Retropubic or Transobturator Midurethral Slings in a Randomized Cohort of Turkish Women," 93 Urologia Internationalis 449 (2014).

The studies showed that each approach had benefits and risks. The question under *Bifolck 1* is not simply whether there are other feasible designs, but whether there is a feasible design that would have reduced or avoided the risk of harm to Fajardo. This complicated medical evidence demonstrates that the jury needed the assistance of an expert qualified to testify regarding product design to enable the jury to make an intelligent decision regarding whether there was a reasonable alternative design that would have reduced or avoided the risk of harm to Fajardo. The plaintiffs failed to produce that expert evidence, and therefore, its request for an instruction under *Bifolck 1* was properly denied.

Fajardo *v.* Boston Scientific Corp.

testimony on that issue was fatal to the plaintiffs' claim under the reasonable alternative design theory of *Bifolck 1*.

To be sure, the Restatement (Third) also makes clear that "[i]t is not sufficient that the alternative design would have reduced or prevented the harm suffered by the plaintiff if it would also have introduced into the product other dangers of equal or greater magnitude." Restatement (Third), supra, § 2, comment (f), p. 23. Rosenzweig testified that a substantial contributing factor of Fajardo's injuries was the fact that she experienced a foreign body reaction to the Obtryx. Rosenzweig explained that polypropylene mesh slings can cause this type of reaction. Accordingly, Rosenzweig opined that all polypropylene mesh slings are defective and unreasonably dangerous. He specifically opined that the Ethicon branded TVT, which is made of polypropylene mesh, was defective. Given this testimony from the plaintiffs' product design expert, we cannot see how the plaintiffs could have successfully claimed that the Ethicon branded TVT or the class of TVTs was a reasonable alternative design that would have reduced or avoided the harm suffered by Fajardo. Therefore, the trial court was correct not to instruct the jury on the reasonable alternative design prong.

Even if we were to consider Bercik's testimony as expert testimony on reasonable alternative design, as the concurrence and dissent suggests; see, e.g., footnote 6 of the concurring and dissenting opinion; we cannot conclude that it supports the plaintiffs' request for a reasonable alternative design instruction. First, Bercik's testimony was not based on sufficient data to comment on reasonable alternative design. Bercik never established his qualifications regarding product design and testified that he was unaware of a key design element of the Ethicon branded TVT, namely, the type of mesh

341 Conn. 535      FEBRUARY, 2022      585

Fajardo *v.* Boston Scientific Corp.

used in the product.[22] Furthermore, the fact that Bercik
testified that he prefers the Ethicon branded TVT does
not support a reasonable finding that it would have
reduced or avoided the risk of harm to Fajardo. Beside
knowing next to nothing about the design features of
the Obtryx, and not remembering why he stopped using
it, he also admitted that, although his preference is
for the Ethicon branded TVT, his supervisor uses the

---

[22] At trial, Bercik testified as follows:

"Q. What kind of polypropylene is the TVT sling made of that you use?

"A. I'm not sure—I'm not sure what you're asking.

"Q. Is a TVT sling made of the same polypropylene as the Obtryx sling?

* * *

"Q. Doctor, do you know what kind of polypropylene the Obtryx sling is
made of?

"A. I do know it's made of something called—I think Marlex.

"Q. Okay.

"A. It's what they use.

"Q. Okay. Do you know . . . if the TVT sling is made of the same Marlex?

"A. I don't know if it's made of the same—like, from the same manufacturer
or anything like that.

"Q. Okay. Is—

"A. I don't know.

"Q. —is TVT made by the same manufacturer as the Obtryx sling?

"A. No, ma'am.

"Q. Okay.

"A. Different company."

Although the concurrence and dissent asserts that Bercik's testimony is
not necessary or important to its position; see footnote 6 of the concurring
and dissenting opinion; it cites to his testimony no less than thirty-seven
times, refers to the fact that Bercik was disclosed as a product design expert,
and relies on him as such. However, by characterizing Bercik as a product
design expert, the concurrence and dissent disregards the fact that there
was a motion in limine to exclude him from testifying as a product design
expert. Although there is not a clear ruling on that motion in the record,
there is discussion on the record about his testimony being limited, and
Bercik testified that he was not aware of a key aspect of the design of the
Ethicon branded TVT, namely, the type of mesh from which it is made.
Moreover, in its memorandum of decision, the trial court explained that
"Rosenzweig . . . was [the plaintiffs'] product design expert," and the plain-
tiffs neither challenge that conclusion on appeal nor cite to Bercik in support
of their claim. Accordingly, we disagree with the efforts of the concurrence
and dissent to cast Bercik as qualified to give expert testimony regarding
whether the TVT was a reasonable alternative design for the Obtryx.

Fajardo *v.* Boston Scientific Corp.

Obtryx. Thus, in his testimony, he acknowledged his preference for the Ethicon branded TVT, but that testimony does not establish that it is a reasonable alternative design to the Obtryx that would have reduced or avoided the risk of harm to Fajardo.[23]

We do not agree with the concurrence and dissent that other studies and documents that were entered into evidence were sufficient to support a reasonable alternative design claim.[24] See parts II A 1 and 2 of the concurring and dissenting opinion. At most, these studies demonstrate that the Ethicon branded TVT was the first tension free vaginal tape manufactured, and for that reason, there is more data evaluating its safety and effectiveness. Nevertheless, the evidence in the studies demonstrate that, "[a]lthough the [Ethicon branded] TVT was the first [midurethral] sling to gain widespread acceptance, numerous other [midurethral] sling systems have subsequently been introduced. While all of the meshes consist of a knitted polypropylene

_____

[23] The concurrence and dissent asserts that Bercik "indicated that he had tried using the Obtryx, which employs a transobturator approach, had a negative experience with it, and so began using the Ethicon TVT, which uses a different approach." Footnote 22 of the concurring and dissenting opinion. That does not accurately characterize Bercik's actual testimony. He testified that he had implanted slings using the transobturator approach in the past but that he had stopped doing that because of complications. He then clarified that he had "trialed the [Obtryx] maybe once in the operating room" and had "never used it on a regular basis . . . ." He further explained: "I think I mentioned I [tried] the Obtryx once, and I don't remember why I don't—it was something about it that I didn't like. I don't know, I don't recall, it was ten years ago. But I gave up using other obturator approach slings because of my experience." Contrary to the representations of the concurring and dissenting opinion; see footnote 22 of the concurring and dissenting opinion and accompanying text; Bercik clearly testified that his "negative experience" was with other slings implanted using the transobturator approach, not the Obtryx.

[24] The plaintiffs assert that "[t]here were also a number of other studies admitted as full exhibits [that] supported the claim that the risks of the Obtryx outweigh its benefits in comparison with safer alternatives on the market at the time." The plaintiffs did not, however, identify the studies to which they refer.

341 Conn. 535     FEBRUARY, 2022     587

Fajardo *v.* Boston Scientific Corp.

material, they have been altered as a marketing strategy to overcome [clinician perceived] deficiencies in the [Ethicon branded] TVT.'' P. Moalli et al., supra, 19 International Urogynecology J. 655.

Furthermore, also contrary to the representations of the concurrence and dissent, the evidence did not demonstrate that the class of TVTs or the Ethicon branded TVT is the ''gold standard'' to treat stress urinary incontinence. Part II A 1 of the concurring and dissenting opinion. The concurrence and dissent asserts that, ''although the majority steadfastly resists this fact, expert witnesses and evidence from scholarly journals on which those witnesses relied repeatedly identified the TVT as the 'gold standard,' [and/or] 'the standard of care' . . . .'' Id. However, no expert in the present case pointed to the TVT (either the Ethicon branded TVT or the class of products known as the TVT) as the ''gold standard.'' Thus, no one explained what is meant by the term. Instead, the design expert in the present case testified that all slings made of polypropylene mesh are unreasonably dangerous and that a surgical procedure is the best method for treating stress urinary incontinence.[25]

---

[25] One of the studies introduced into evidence explains: ''The retropubic tension-free vaginal tape (TVT, Gynecare, Somerville, NJ, USA) which was introduced in [the] 1990s is commonly acknowledged as the gold standard of [midurethral slings] by virtue of its extensive safety and efficacy data in the literature.'' Y. Lim et al., ''Do the Advantage Slings Work As Well As the Tension-Free Vaginal Tapes?,'' 21 International Urogynecology J. 1157, 1157 (2010) (Lim study). Although the Lim study does state that the TVT has the most extensive data and was the original vaginal sling on the market, its authors concluded: ''In this study, we found that the Advantage sling appears to be as effective as the TVT. There was a trend [toward] more overactive bladder and voiding difficulty issues, which may be related to the slightly stiffer nature of the Advantage sling, thus requiring the Advantage slings to be left slightly looser than [the] TVT. Further randomized controlled trials are necessary to confirm this supposition.'' Id., 1161.

Thus, although the Lim study may establish that the Ethicon branded TVT was a feasible alternative to the Obtryx, it does not establish that it would have reduced or avoided the risk of harm to Fajardo. The concurrence and dissent repeatedly uses the term ''gold standard'' to imply that the Ethicon

Fajardo *v.* Boston Scientific Corp.

In the present case, the plaintiffs simply did not introduce sufficient evidence to warrant an instruction on a reasonable alternative design. We find a recent case from the United States District Court for the District of Connecticut instructive in this regard. In granting a manufacturer's motion for summary judgment on a reasonable alternative design claim, the court explained that the plaintiff "has not established that a reasonable alternative [water treatment] pump design was available. [The expert's] report, even if admitted, does not identify a reasonable alternative. Rather, [the expert's] report opines that [the plaintiff] should have used [the competitor's] pumps, which have larger motors. However, the [competitor's] motors would have required an expensive reworking of the system as a whole, and were considered and rejected by [the plaintiff] during the bidding process. . . . [The plaintiff] has offered no evidence that a 'reasonable alternative design was available' for pumps that would meet the [plaintiff's] system specifications 'that would have avoided or reduced the risk of harm' without 'unreasonably increasing cost.' '' (Citation omitted.) *Water Pollution Control Authority* v. *Flowserve US, Inc.*, supra, 2018 WL 1525709, *25.

Similarly, the plaintiffs in the present case did not produce sufficient evidence that an alternative design was available that would have met Fajardo's needs and have avoided or reduced the risk of harm without unreasonably increasing cost. To the contrary, evidence presented at trial showed that the class of TVTs had varying degrees of safety, depending on the type of material

branded TVT was the safest product on the market. But, as we have explained previously in this opinion, there was evidence presented at trial that the Ethicon branded TVT and each of the other products within the class of TVTs had risks and complications associated with them. In light of the fact that they were complicated medical devices with complicated safety information, the plaintiffs had to do more to demonstrate that use of the Ethicon branded TVT would have reduced or avoided the risk of harm to Fajardo.

Fajardo *v.* Boston Scientific Corp.

that was used to make them, and some even had the exact same defect alleged to have caused Fajardo's injuries in this case. Furthermore, the plaintiffs' expert testified that all polypropylene mesh slings are defective, including the Ethicon branded TVT. Accordingly, we cannot conclude that the trial court incorrectly determined that the plaintiffs did not produce sufficient evidence of a reasonable alternative design that would have avoided injuries to Fajardo to warrant an instruction on reasonable alternative design.

The plaintiffs cite to *Campbell* v. *Boston Scientific Corp.*, 882 F.3d 70 (4th Cir. 2018), in support of their claim that there was sufficient evidence in the present case to warrant an instruction on the reasonable alternative design prong. We disagree. In that case, the defendant claimed that there was insufficient evidence to support the jury verdict and, specifically, to show that there was a safer alternative design. See id., 79. Based on the trial record and the expert's testimony in that case, the Fourth Circuit concluded that there was sufficient evidence to support the safer alternative design claim. As one example of evidence that supported the plaintiffs' claim in that case, the court pointed to the expert's testimony regarding the Ross study. See id. The Fourth Circuit's conclusion that, based on the particular safer alternative design claim made by the plaintiffs in that case and supported by evidence, the Ross study supported the safer alternative design claim.

The Fourth Circuit's conclusion, however, does not mean that the Ross study will always support a reasonable alternative design claim. In the present case, the Ross study does not support the plaintiffs' claim that there is a reasonable alternative design, particularly because the plaintiffs claimed and their expert testified that the heat-sealed mesh used in the Obtryx caused Fajardo's injuries. Because the Ross study compared

Fajardo *v.* Boston Scientific Corp.

two slings made of the exact same heat-sealed mesh, that study is not evidence of a reasonable alternative design, in light of the claim that was presented by the plaintiffs in this case.

Based on the foregoing, we conclude that the plaintiffs did not produce sufficient evidence to warrant an instruction on a reasonable alternative design. Accordingly, we conclude that the trial court properly declined their request for such an instruction.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and PALMER, D'AURIA and KAHN, Js., concurred.

ECKER, J., concurring in part and dissenting in part. I agree with, and join, part I and much of parts II A and B[1] of the majority opinion. I disagree, however, with parts II C through E, in which the majority concludes that the trial court properly declined to charge the jury on the reasonable alternative design prong of the risk-utility component of the Connecticut Product Liability Act, General Statutes § 52-572m et seq., as interpreted by this court in *Bifolck* v. *Philip Morris, Inc.*, 324 Conn. 402, 434–35, 152 A.3d 1183 (2016). Specifically, I do not agree with the majority's conclusion that the plaintiffs, Lesly Fajardo (Fajardo) and Jairo Fajardo, "did not produce sufficient evidence . . . to

---

[1] I agree with all of part II A except the majority's ultimate conclusion that "the trial court correctly concluded that the evidence did not support an instruction under the reasonable alternative design prong of the risk-utility test . . . ." Part II A of the majority opinion. In part II B, the majority assumes, without deciding, that the plaintiffs' instructional challenge was properly preserved at trial. For the reasons identified by the majority, I have no difficulty concluding that the issue is in fact properly preserved. Specifically, I agree with the majority that it would elevate form over substance to refuse to consider the issue on appeal when the trial court resolved it on the merits after concluding that the legal claim was timely presented. See part II B of the majority opinion.

Fajardo *v.* Boston Scientific Corp.

warrant an instruction on reasonable alternative design.'' Part II E of the majority opinion.

The trial court concluded that there was insufficient evidence in the trial record to support a jury instruction on the plaintiffs' claim that the Obtryx Transobturator Mid-Urethral Sling System designed by the named defendant, Boston Scientific Corporation, was defective under the risk-utility test because there was a viable and safer reasonable alternative design to the Obtryx. For the reasons set forth at length in part II of this opinion, I am convinced that this ruling was erroneous. There was abundant evidence presented at trial from which the jury could have concluded that one particular competitor product, a retropubic tension free vaginal sling trademarked "TVT" that is produced by Gynecare, part of the Ethicon division of Johnson & Johnson,[2] qualified as a reasonable alternative to the Obtryx. It was undisputed that not only is this TVT commercially viable, it is the most widely used treatment for stress urinary incontinence, the condition suffered by Fajardo, and meets the recognized standard of care for treatment of that condition. The plaintiffs proffered expert testimony, including the testimony of retained experts, Fajardo's treating physicians, and articles in respected medical research journals, that, if credited by the jury, together established that (1) the Obtryx differs from Ethicon's TVT in three primary respects, namely, its transobturator approach, its heat-sealed middle section, and its detanged edges, (2) each of those departures from the design of the TVT constitutes a defect, because they each increase the risks to the patient with no offsetting benefit, (3) the injuries that Fajardo suffered

---

[2] In part III A of this opinion, I explain why the majority is incorrect when it contends that all of the references to "TVT" at trial were to the category of TVT-type retropubic slings modeled on Ethicon's branded TVT, rather than to that market-leading product itself. See footnote 14 of the majority opinion and accompanying text. Unless otherwise noted, all references in this opinion to the TVT are to the Ethicon product.

Fajardo *v.* Boston Scientific Corp.

were caused by those design defects, and (4) the TVT would have avoided or reduced the risk of those types of harm and been a more suitable choice for Fajardo. Nothing more is required to warrant a jury instruction on a theory of reasonable alternative design under *Bifolck*. For these reasons, I respectfully concur in part and dissent in part.

I

Before I discuss the evidence in the record that warranted a reasonable alternative design jury charge, I emphasize three important preliminary points that should be uncontroversial. First, I agree with the majority regarding the standard of review. "[A] trial court should instruct the jury in accordance with a party's request to charge if the proposed instructions are reasonably supported by the evidence. . . . *We therefore review the evidence presented at trial in the light most favorable to supporting the* [*plaintiffs'*] *proposed charge.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 139, 757 A.2d 516 (2000). The emphasized language carries constitutional significance. "It must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury and not by the court." (Internal quotation marks omitted.) *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 499, 656 A.2d 1009 (1995). For this reason, "[a] trial court should instruct a jury on [every] issue for which there is any foundation in the evidence, even if weak . . . ." (Internal quotation marks omitted.) *Henriques* v. *Magnavice*, 59 Conn. App. 333, 336, 757 A.2d 627 (2000); see also *Curran* v. *Kroll*, 303 Conn. 845, 857, 37 A.3d 700 (2012) ("it is well established that a plaintiff has the same right to submit a weak case as he has to submit a strong one" (internal quotation marks omitted)).

Fajardo *v.* Boston Scientific Corp.

Second, the essential elements of a product liability claim predicated on a design defect are well established. The plaintiff must establish each of the following elements by a preponderance of the evidence: (1) the defendant was engaged in the business of selling the product; (2) the product was, by reason of its design, in a defective condition unreasonably dangerous to the consumer; and (3) the defect caused the injury for which compensation is sought. See, e.g., *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 434; Connecticut Civil Jury Instructions § 3.10-1, available at https://www.jud.ct.gov/JI/Civil/Civil.pdf (last visited December 10, 2021). When the plaintiff seeks to establish the second element—defective design—on a reasonable alternative design theory, he or she also must establish that (A) a reasonable alternative design was available (B) that would have avoided or reduced the risk of harm, and (C) the failure to use that alternative design rendered the product unreasonably dangerous. See, e.g., *Bifolck* v. *Philip Morris, Inc.*, supra, 434–35; see also footnote 16 of this opinion. A reasonable alternative design instruction is *required* if there is sufficient evidence in the record to permit the jury to find for the plaintiff on each of these elements.

Third, although the majority correctly observes that the existence of a reasonable alternative design typically must be established, at least in part, via expert testimony;[3] see part II C of the majority opinion; this court never has imposed a unitary source requirement such that a *single* expert must provide all component parts of that expert opinion. As I discuss more fully in part III C of this opinion, no rule or principle precludes the jury from piecing together the requisite quantum of proof from multiple sources, including the testimony of one or more expert witnesses, articles or other writings

_____

[3] See, e.g., *Izzarelli* v. *R.J. Reynolds Tobacco Co.*, 321 Conn. 172, 203–204, 136 A.3d 1232 (2016).

Fajardo *v.* Boston Scientific Corp.

containing expert opinions admitted in evidence without restriction, and other qualifying evidence, including circumstantial evidence. See, e.g., *Thompson* v. *Ethicon, Inc.*, Docket No. SAG-19-03159, 2020 WL 3893253, *5 (D. Md. July 10, 2020) (court was aware of "no authority [requiring] that a single expert witness establish each element of a claim"); *Slepski* v. *Williams Ford, Inc.*, 170 Conn. 18, 22, 364 A.2d 175 (1975) (jury in product defect case may rely on combination of expert testimony, lay witnesses, and circumstantial evidence); *Morgan* v. *Hill*, 139 Conn. 159, 161–62, 90 A.2d 641 (1952) (trier was privileged to accept portions of different experts' conflicting testimony in arriving at estimate of damage); *Louisiana Dept. of Transportation & Development* v. *Scramuzza*, 673 So. 2d 1249, 1261 n.10 (La. App. 1996) ("[j]uries may even mix and match parts of several expert opinions"), rev'd in part on other grounds, 692 So. 2d 1024 (La. 1997); *Bieniek* v. *Keir*, Docket No. A-3096-06T5, 2008 WL 1848293, *5 (N.J. Super. App. Div. April 23, 2008) (jury properly could have accepted different portions of dueling experts' conclusions).

Moreover, is well established that a jury may draw reasonable inferences from an expert's testimony no less than the testimony of any other witness and come, thereby, to a conclusion that it could not permissibly reach solely on the basis of lay knowledge. See, e.g., *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, 175 Conn. App. 692, 725–27, 168 A.3d 538 (although no single expert testified that decedent died of delayed respiratory depression, jury reasonably could have inferred such from all expert testimony considered together), cert. denied, 327 Conn. 960, 172 A.3d 801 (2017); *Carter* v. *State*, 620 S.W.3d 147, 153 (Tex. Crim. App. 2021) ("At first glance, it seems irrational to expect an ordinary [fact finder] to make an inference regarding positioning of certain components in a synthetic compound. But, the mere fact that an ordinary [fact finder], prior

Fajardo *v.* Boston Scientific Corp.

to any evidence being presented, could not make the required inferential step, does not mean that an informed [fact finder] could not reasonably make such an inference. That is all to say that an ordinary jury could still draw a reasonable inference from an expert's testimony about technical elements as long as each inference is supported by the evidence presented at trial.''), petition for cert. filed (U.S. August 24, 2021) (No. 21-269); *Anderson* v. *Combustion Engineering, Inc.*, 256 Wis. 2d 389, 394, 647 N.W.2d 460 (2002) (''a jury is entitled to draw reasonable inferences from expert testimony even if, at first blush, it may appear that the jury's conclusions based on those inferences require proof by specialized expert testimony'').

Likewise—and this becomes particularly important with respect to the testimony of the plaintiffs' primary design expert, Bruce A. Rosenzweig, a professor of uro-gynecology—the jury is free to credit one portion of an expert's testimony while rejecting a different part of that same testimony. See, e.g., *State* v. *Leroya M.*, Conn. , , A.3d (2021) (''[t]he [fact finder] is free to accept or reject each expert's opinion in whole or in part'' (internal quotation marks omitted)); *Grondin* v. *Curi*, 262 Conn. 637, 657 n.20, 817 A.2d 61 (2003) (''[I]t is the province of the jury to weigh the evidence and determine the credibility and the effect of testimony . . . . [T]he jury is free to accept or reject each expert's opinion in whole or in part.'' (Internal quotation marks omitted.)); *In re David W.*, 254 Conn. 676, 693, 759 A.2d 89 (2000) (''the trier is entitled to accept in part . . . [and] disregard in part . . . the uncontradicted testimony of [an expert] witness''); *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 545, 562 A.2d 1100 (1989) (''the trier of fact may accept part of the testimony of an expert without being bound by all of the opinion of the expert'' (internal quotation marks omitted)); *Yontef* v. *Yontef*, 185 Conn. 275, 281, 440 A.2d

Fajardo *v.* Boston Scientific Corp.

899 (1981) ("[the trier of fact] is free to rely on whatever parts of an expert's opinion the [trier] finds probative and helpful"). I do not understand the majority to have intended to dispense with this indisputable rule; nor does the majority suggest any reason why it should not apply in the present case. Indeed, it applies with full force because Boston Scientific has relied—both at trial and on appeal—almost exclusively on the specious argument that the jury could not have credited Rosenzweig's testimony that the Obtryx is defective vis-à-vis the TVT because Rosenzweig also believed that *all* polypropylene slings are defective. I explain the many failings in this argument in part III B of this opinion, an analysis to which the majority has offered no response.

II

With these principles in mind, I turn now to the evidence that was presented at trial in support of the plaintiffs' theory that the TVT represented a reasonable alternative design at the time Boston Scientific marketed and sold Fajardo's Obtryx. It is undisputed that Boston Scientific was engaged in the business of selling the Obtryx and, therefore, that the first element of the plaintiffs' product liability claim was established. My disagreement with the majority centers on the second (defective condition unreasonably dangerous to the consumer, which includes proof of feasibility) and third (causation) elements of the claim.

A

1

Beginning with feasibility, I note that there was overwhelming evidence at trial that the TVT is a feasible design. Indeed, although the majority steadfastly resists this fact, expert witnesses and evidence from scholarly journals on which those witnesses relied repeatedly identified the TVT as the "gold standard," "the standard

341 Conn. 535      FEBRUARY, 2022      597

Fajardo *v.* Boston Scientific Corp.

of care,'' and/or the most widely used treatment for precisely the condition from which Fajardo suffered. A ''gold standard,'' commercially available product is the paradigmatic feasible alternative.

Four different research studies entered in evidence as full exhibits, each published in respected medical journals and relied on by the plaintiffs' experts, identified the TVT—either the Ethicon TVT or another TVT-type sling—as the primary accepted treatment for the condition from which Fajardo suffered, namely, female stress urinary incontinence. Three of the studies expressly identified the TVT as the ''gold standard'' for treating Fajardo's condition. See H. Cholhan et al., ''Dyspareunia Associated with Paraurethral Banding in the Transobturator Sling,'' 202 Am. J. Obstetrics & Gynecology 481.e1, 481.e1 (2010) (Cholhan study) (''[TVT is the] widely accepted . . . gold standard for the treatment of [stress urinary incontinence]''); Y. Lim et al., ''Do the Advantage Slings Work As Well As the Tension-Free Vaginal Tapes?,'' 21 International Urogynecology J. 1157, 1157 (2010) (Lim study) (''TVT . . . is commonly acknowledged as the gold standard of [synthetic midurethral slings] by virtue of its extensive safety and efficacy data in the literature''); P. Moalli et al., ''Tensile Properties of Five Commonly Used Mid-Urethral Slings Relative to the TVT,'' 19 International Urogynecology J. 655, 656 (2008) (Moalli study) (TVT is ''the gold standard'').[4] A fourth study in evidence referred to the TVT

_____

[4] Two of these studies, Lim and Moalli, specifically discuss the Ethicon TVT, rather than the class of TVT-like slings, as the gold standard. See Y. Lim et al., supra, 21 International Urogynecology J. 1157; P. Moalli et al., supra, 19 International Urogynecology J. 656. To the extent that the majority faults the plaintiffs for not having identified by name the particular studies that support their reasonable alternative design claim; see footnote 24 of the majority opinion; the studies that they reference and that I discuss in this opinion were provided to us in the appendix to the plaintiffs' brief, and are the same studies that their experts discussed at length at trial and that they cited in their arguments to the judge and jury.

Fajardo *v.* Boston Scientific Corp.

as "the surgery of choice for treating stress urinary incontinence" and "the standard of care." S. Ross et al., "Transobturator Tape Compared with Tension-Free Vaginal Tape for Stress Incontinence: A Randomized Controlled Trial," 114 Obstetrics & Gynecology 1287, 1287–88 (2009) (Ross study).

In light of the fact that four of the studies relied on by the plaintiffs' experts expressly state that the TVT is the "gold standard" or "standard of care" for the treatment of female stress urinary incontinence, it is difficult to understand the majority's insistence that "the evidence in the record did not establish that the Ethicon branded TVT is the 'gold standard' to treat stress urinary incontinence." Footnote 20 of the majority opinion. The question is not whether the majority would have been persuaded by that evidence had they sat as jurors, or whether I am persuaded by it, but, rather, whether there was *any* evidence on the basis of which *the jury* could have reached that conclusion. Clearly there was, and the majority offers no explanation why the jury could not reasonably have relied on the statements and opinions contained in medical studies admitted as substantive evidence at trial.[5]

In addition, the jury reasonably could have found that two of Fajardo's treating physicians, Richard Bercik, a urogynelogical reconstructive surgeon and professor of female pelvic medicine at Yale School of Medicine, and Brian Hines, a urogynecologist, specifically recommended that Fajardo consider use of the TVT to treat her condition. Bercik further testified that he and his colleagues have had negative experiences with transobturator slings such as the Obtryx and generally have stopped

_____

[5] None of these studies, for example, suggested that the TVT is suitable only for certain women or only under certain conditions, or only as a replacement after another sling has been removed, or that it is more expensive than other slings, or otherwise not feasible for patients such as Fajardo.

Fajardo *v.* Boston Scientific Corp.

implanting them in favor of the TVT.[6] This evidence would have permitted the jury to conclude not only that the TVT is, in general, a viable alternative to the Obtryx that is readily available in Connecticut, but also that it was well suited to Fajardo's individual needs.

Finally, it was clear from the evidence presented at trial that the defendant's own expert witness, Peter L. Rosenblatt, also a urogynecologist, concurred that the TVT is a feasible alternative design. In a 2004 article

---

[6] The majority seems to take the position that we should not take Bercik's testimony into account for any purpose when considering whether there was sufficient evidence before the jury to warrant a reasonable alternative design instruction. The majority argues that (1) although Bercik was disclosed as an expert on sling design and design alternatives, and apparently recognized by the defendants' counsel as such, he purported to testify only as a "treating physician," (2) the plaintiffs do not cite to Bercik's testimony in their appellate briefs, (3) the trial court did not consider Bercik's testimony when it denied the plaintiffs' instructional request, and (4) Bercik's testimony lacked credibility. See footnotes 12, 13 and 22 of the majority opinion and accompanying text. First, Bercik's testimony is cited herein for very limited purposes, is relied on only as secondary evidence, and is not necessary or even important to my position—the testimony of Rosenzweig (who testified that he relied on Bercik's assessment and testimony in forming his own opinions) and the various studies and other documents on which he relied were sufficient to warrant a reasonable alternative design instruction. Second, and more generally, I disagree with the majority's all-or-nothing analysis with respect to the use of Bercik's testimony. As I explain in part III C of this opinion, once Bercik's testimony was admitted without objection or limitation, it was available for the jury to use for any purpose; it must be construed in the light most favorable to the plaintiffs' request, regardless of whether the trial court overlooked it or whether the majority deems it to be credible or deems Bercik to be a fitting expert. Bercik's notes recommending that Fajardo consider a TVT were before the trial court when it considered the plaintiffs' motion, and, indeed, the defendants' counsel himself solicited much of the testimony to which the majority objects. To the extent that the trial court failed or declined to consider that evidence of record, that omission was either proper or improper as a matter of law and was not, as the majority incorrectly posits, a factual "finding" to which we must defer. Footnote 13 of the majority opinion. I do agree with the majority that the plaintiffs' counsel has not relied on Bercik's testimony on appeal, and I discount its importance primarily for that reason. That said, I do not ignore this evidence altogether when it was relied on by Rosenzweig and reinforces a proposition established by other evidence.

Fajardo *v.* Boston Scientific Corp.

that was admitted into evidence, Rosenblatt wrote that, with the invention of the Gynecare TVT, "[f]or the first time, surgeons had a reproducible, highly-effective, minimally-invasive sling procedure." P. Rosenblatt & S. Pulliam, "Update on Suburethral Slings for Stress Urinary Incontinence," Contemporary OB/GYN, April 15, 2004, available at https://www.contemporaryobgyn.net/ view/update-suburethral-slings-stress-urinary-incontinence (last visited December 10, 2021); see id. ("study after study has consistently demonstrated the procedure's safety and effectiveness"). Rosenblatt testified at trial that, of the roughly 2000 studies showing that polypropylene slings are safe and effective for the treatment of female stress urinary incontinence, most have studied the TVT. Bercik agreed with Rosenblatt that the TVT is safe and effective. The fact that a product has been shown to be safe and effective in treating a particular condition necessarily implies that it is a feasible alternative for that purpose. See, e.g., *Kosmynka* v. *Polaris Industries, Inc.*, 462 F.3d 74, 80 (2d Cir. 2006) ("[p]ractical engineering feasibility can be demonstrated by expert testimony concerning either a prototype that the expert has prepared or similar equipment using an alternative design that has been put into use by other makers"); *Messina* v. *Ethicon, Inc.*, Docket No. 6:20-cv-1170-Orl-40LRH, 2020 WL 7419586, *4 (M.D. Fla. December 17, 2020) ("safe and effective" implies feasible); *Wald* v. *Costco Wholesale Corp.*, Docket No. 03 Civ. 6308JSR, 2005 WL 425864, *7 (S.D.N.Y. February 22, 2005) ("To satisfy the first and most important element, lack of reasonable safety, plaintiffs must show that it was feasible to design the product in a safer manner. . . . [The] [p]laintiff has done so in one of the most basic ways: he has identified makers of similar equipment who have already put into use the alternative design that has been proposed." (Citation omitted; internal quotation marks omitted.)); Restatement (Third),

341 Conn. 535 FEBRUARY, 2022 601

Fajardo *v.* Boston Scientific Corp.

Torts, Products Liability § 2, comment (f), pp. 23–24 (1998) ("Cases arise in which the feasibility of a reasonable alternative design is obvious and understandable to laypersons and therefore expert testimony is unnecessary to support a finding that the product should have been designed differently and more safely. . . . [O]ther products already available on the market may serve the same or very similar function at lower risk and at comparable cost. Such products may serve as reasonable alternatives to the product in question.").

Once experts for both sides had established that the TVT represents an alternative to the Obtryx that is widely used to treat Fajardo's condition and is deemed safe and effective by the medical community, and had provided the necessary context for the jury to understand the supporting clinical studies in evidence, the jury was free to conclude that the plaintiffs had shouldered their burden of establishing feasibility under *Bifolck*. Although the majority takes issue with some of my analysis in this regard, I understand the majority to agree with the ultimate conclusion in this part of my opinion that the TVT, as a successful and widely commercialized product, represents a technologically and economically viable alternative to the Obtryx that would have been a feasible option for Fajardo. I believe that our disagreement, instead, is limited to whether the jury reasonably could have found that use of the TVT would have avoided or reduced the risk of harm presented by the Obtryx. I address those issues in parts II A 2 and B of this opinion.

2

The plaintiffs next needed to establish that the design of the Obtryx renders it unreasonably dangerous relative to the TVT and, hence, defective. They did this by demonstrating that, although the two slings are similar, the Obtryx has three distinguishing features, each of

Fajardo *v.* Boston Scientific Corp.

which renders it more dangerous than the TVT without any corresponding benefit: it has a heat-sealed middle section that makes it less flexible and more subject to contraction than other slings, it features detanged edges that hinder the integration of the sling with native tissue, and it is designed for a transobturator approach, which results in more palpable tape (a characteristic linked to tape extrusion and vaginal erosion) and paraurethral banding (linked to leading to internal dyspareunia), as well as vaginal tenderness and groin pain.

There was abundant evidence from which the jury could have found that these three design features, which undisputedly constitute the primary design differences between the TVT and the Obtryx, render the Obtryx unreasonably dangerous. With respect to heat sealing, Rosenzweig explained to the jury how the Lim and Moalli studies found that the unique heat sealing process used by Boston Scientific renders its sling products significantly stiffer than the TVT and, therefore, potentially more likely to cause erosion, vaginal obstruction, and voiding dysfunction. See Y. Lim et al., supra, 21 International Urogynecology J. 1161; P. Moalli et al., supra, 19 International. Urogynecology J. 662.[7] Rosenzweig also testified that the heat sealing process aggravates the foreign body reaction associated with the use of polypropylene mesh. He explained that the heat-sealed center portion makes the Obtryx stiffer than other midurethral slings and that "stiffness of mesh is a bad property" that is associated with a higher rate of

[7] I disagree with the majority's statement that, "[a]t most, these studies demonstrate that the Ethicon branded TVT was the first tension free vaginal tape manufactured, and for that reason, there is more data evaluating its safety and effectiveness." Part II E of the majority opinion. The significance of the studies is not so limited. The Moalli study, for example, compared the Ethicon TVT to five more recently developed slings, including the Obtryx, and concluded that the TVT "has a unique tensile behavior" that "in theory . . . lowers the rate of erosions of a sling into the urethra or bladder." P. Moalli et al., supra, 19 International Urogynecology J. 662.

Fajardo *v.* Boston Scientific Corp.

complications, such as inflammation, groin pain, scarring, urgency, overactive bladder, vaginal erosion, and dyspareunia, or pain during intercourse. Whereas Rosenzweig testified that midurethral slings such as the Obtryx can contract, causing chronic pain, Bercik testified that, in his clinical experience, significant contracture does not tend to occur with the TVT.

Similarly, with respect to detanging, the Moalli study, on which Rosenzweig relied, stated that the tanged edges of the TVT were "designed to 'grip' tissue after sling placement." P. Moalli et al., supra, 19 International. Urogynecology J. 655. Doreen Rao, a principal engineer for Boston Scientific, acknowledged that some of her colleagues thought that maintaining the tangs—rough edges where the polypropylene mesh had been cut— was useful in holding the sling in place and promoting ingrowth of native tissue. Rao referred to this as the "leading theory." Rao was unable to document any offsetting benefits from Boston Scientific's decision to remove the tangs, other than that detanging "presents a smoother surface." Rosenzweig testified more definitively that detanging adds no benefit to outweigh the heightened risks associated with a lack of integration of the sling with the patient's native tissue. The jury should have been given the option to agree with Rosenzweig insofar as his testimony spoke to the shortcomings of the Obtryx relative to the TVT.

With respect to the risks associated with the transobturator design of the Obtryx, the plaintiffs highlighted the Ross study, a randomized, double blind, clinical study of nearly 200 women, which compared the Obtryx to Boston Scientific's own Advantage retropubic midurethral sling. See S. Ross et al., supra, 114 Obstetrics & Gynecology 1288–89. Because the two slings are made from the same material and share other common design features, the study was able to isolate the safety and effectiveness of using a transobturator approach vis-à-

Fajardo *v.* Boston Scientific Corp.

vis the traditional retropubic approach. The study found no statistically significant difference in the products' cure rates. See id., 1291. The study did find, however, that the vaginal mesh was much more likely to remain palpable to the touch one year after surgery among women who received transobturator slings, an outcome that the authors deemed "concerning" due to the heightened risk of tape extrusion and vaginal erosion. Id., 1293; see id., 1287–88, 1290. More women in the transobturator group also experienced tenderness and groin pain. See id., 1290, 1292–93. The authors' final conclusion: "Compared with the [Advantage] TVT group, more women in the transobturator tape group had tape that was palpable and groin pain on vaginal examination. The presence of palpable tape is concerning; longer follow-up is needed to determine whether this outcome leads to extrusion or resolves over time. Until long-term follow-up is available from this and other trials, TVT should remain the midurethral sling procedure of choice." Id., 1293–94. The Cholhan study likewise suggested that tapes such as the TVT, which feature a retropubic design, have a more favorable risk-benefit profile than do transobturator tapes, such as the Obtryx, for the treatment of female stress urinary incontinence. See H. Cholhan et al., supra, 202 Am. J. Obstetrics & Gynecology 481.e1. That study identified a "concerning" new complication—paraurethral banding, leading to internal dyspareunia—that occurred in transobturator but not retropubic sling patients.[8] Id., 481.e3.

_____

[8] Although the plaintiffs' counsel highlighted the Ross and Cholhan studies to make this point, that was not the only evidence before the jury indicating that the use of a transobturator design was a defect relative to the TVT. One study on which Rosenzweig relied, for example, found that "[t]he complications of persistent pain and dyspareunia were strikingly more frequent among [the transobturator] compared to [the retropubic] group." E. Petri & K. Ashok, "Comparison of Late Complications of Retropubic and Transobturator Slings in Stress Urinary Incontinence," 23 International Urogynecology J. 321, 324 (2012) (Petri study).

341 Conn. 535 FEBRUARY, 2022 605

Fajardo *v.* Boston Scientific Corp.

Rosenzweig testified that he relied on each of these studies in forming his opinions regarding the product defects and injuries at issue in this case and that they are authoritative in the field. He also made crystal clear the conclusion that the jury itself easily could have drawn from the Cholhan, Lin, Moalli, Ross and other studies in evidence, namely, that these three design features render the Obtryx "defective . . . ." Rosenzweig opined that the unique detanged and heat-sealed features of the Obtryx have no benefits that outweigh the added risks. He characterized the research as demonstrating that, because the transobturator design of the Obtryx was associated with significantly higher incidences of groin pain and other complications, "the retropubic sling is better than the [Obtryx] transobturator sling." Rosenzweig specifically linked negative research findings regarding transobturator slings to Fajardo's Obtryx.[9] He concluded, to a reasonable degree of medical certainty, that "[the Obtryx sling] is defective in design."[10]

In an e-mail to Boston Scientific that also was admitted as a full exhibit, Paul Tulikangas, a urogynecologist and female pelvic medicine and reconstructive surgery specialist, likewise interpreted the medical research to mean that the Obtryx is "inferior" to other midurethral slings, with higher rates of erosion, groin pain, and voiding issues compared to the TVT.[11] Bercik appeared

---

[9] The majority incorrectly states that "Rosenzweig identified only the polypropylene mesh and the heat seal as the defects that caused Fajardo's injuries" and did not consider the transobturator design of the Obtryx to be a defect. Part II E of the majority opinion. Boston Scientific itself concedes that "Rosenzweig testified that retropubic and nondetanged slings may be better" than the Obtryx. I further address this point in part III A of this opinion.

[10] For reasons elaborated in part III B of this opinion, it is of no legal consequence that Rosenzweig also held the view that *all* polypropylene mesh devices (including the TVT) are defective. The jury was entitled to accept Rosenzweig's opinion with respect to the Obtryx in particular and reject his broader opinion regarding the entire class of products.

[11] The majority makes no mention of the Tulikangas opinion letter, but the plaintiffs' counsel referenced the letter three times during closing argument,

Fajardo *v.* Boston Scientific Corp.

to concur, indicating that he had abandoned the use of transobturator slings, including the Obtryx, because he and other physicians experienced a high rate of complications and that he now exclusively uses the TVT.

The foregoing evidence leads me to conclude with confidence that the plaintiffs set out a prima facie case that the three design features by which the Obtryx departs from the TVT render the Obtryx defective. The majority disagrees and, deploying an argument never articulated by Boston Scientific, appears to take the position that the Obtryx could not have been defective relative to the TVT because both products present potential dangers and risks. The majority emphasizes, for example, that "there were risks and complications with the use of the [Ethicon branded] TVT"; part II E of the majority opinion; and that "the Ethicon branded TVT and each of the other products within the class of TVTs had risks and complications associated with them." Footnote 25 of the majority opinion. These observations miss the fundamental point. A design is defective if it creates a *greater* risk of harm than the alternative design without sufficient offsetting benefit, which means that the question is not whether the alternative is risk free, but whether it confers the same benefits with a *lesser* risk of harm. See, e.g., *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 434–35. This point is clear even in the very cases that the majority cites in support of its argument. Thus, the majority cites *Casey* v. *Toyota Motor Engineering Mfg. North America, Inc.*, 770 F.3d 322, 331 (5th Cir. 2014), for the proposition that " '[a] design is not a safer alternative if, under other circumstances, [it would] impose an *equal or greater risk* of harm than the design at issue.' " (Emphasis altered.) Part II E of the majority opinion; see *Water Pollution Control Authority* v. *Flowserve US,*

highlighted the fact that Tulikangas believed that the Obtryx is an inferior product, and referenced the letter in briefing to the trial court.

Fajardo *v.* Boston Scientific Corp.

*Inc.*, Docket No. 3:14-cv-00549 (VLB), 2018 WL 1525709, *25 (D. Conn. March 28, 2018) (plaintiff was required to establish that reasonable alternative design ''would have avoided or reduced the risk of harm *without unreasonably increasing cost*'' (emphasis added; internal quotation marks omitted)), aff'd, 782 Fed. Appx. 9 (2d Cir. 2019).

It is, of course, true that, if an alternative design reduces certain risks but increases other risks, or raises costs, or reduces functionality, it may not be a *reasonable* alternative design. But the majority is incorrect that, if two competing medical product designs both have benefits, and both have risks, then neither can be defective, and neither can be a reasonable alternative design. *Every* medical product and procedure involve some degree of risk. The plaintiffs' task was not to demonstrate that the TVT is risk free. Rather, they had only to present evidence from which the jury reasonably could conclude that the Obtryx was unnecessarily dangerous and that the TVT reduces those dangers without sacrificing functionality and without adding other, offsetting risks or costs.

The evidence cited in the preceding paragraphs establishes precisely that. Indeed, viewing the evidence in the light most favorable to the plaintiffs, this case presents a textbook example of a reasonable alternative design, insofar as Boston Scientific, in designing the Obtryx, essentially took the TVT and altered it in three ways.[12] The jury could have found that, in addition to those risks shared equally by the two products (e.g., surgical risks or risks involved in the body's reaction to foreign materials such as polypropylene), the Obtryx, by virtue of those three alterations, carries three *additional* sets

_____
[12] In its brief, Boston Scientific acknowledges that it ''developed the Advantage mesh from which it makes the Obtryx (and all its midurethral slings) to be substantially similar to other mesh on the market, like the TVT mesh.''

Fajardo *v.* Boston Scientific Corp.

of risks—stemming from its heat-sealed middle, detanged edges, and transobturator design—that (1) are not shared by the TVT, and (2) do not offer any significant offsetting benefits or cost savings.[13] Indeed, Boston Scientific itself acknowledges that, although Rosenzweig was of the view that all polypropylene mesh devices are defective, "Rosenzweig may believe the . . . characteristics [of the Obtryx] allegedly make it more defective/unreasonably dangerous . . . ." Under the applicable law, including the cases on which the majority relies, that showing is enough for the jury to find the Obtryx unreasonably dangerous, and hence defective, on a theory of reasonable alternative design.

B

With respect to the third element of the plaintiffs' defective design claim, which requires evidence that the defective features of the design of the Obtryx caused or contributed to Fajardo's injuries, there was sufficient evidence from which the jury reasonably could have reached that conclusion. First, as I discussed, there was extensive evidence that three specific design elements of the Obtryx increase the risk of harm to patients, including Fajardo. The heat-sealed middle section makes the sling less flexible and more subject to contraction than other slings, which, in turn, aggravates the foreign body reaction associated with the use of polypropylene mesh and results in a higher rate of complications, such as inflammation, groin pain, scarring,

---

[13] The majority repeatedly contends, erroneously, that some products in the class of TVT-type slings "had the exact same defect alleged to have caused Fajardo's injuries in this case." Part II E of the majority opinion. Not so. In fact, the record demonstrates that *no* TVT-type sling has *all* of the defects alleged to make the Obtryx unreasonably dangerous. The jury reasonably could have found, on the basis of the evidence in the record, that any TVT-type sling would have reduced at least some of the risks to Fajardo, such as the risks associated with the use of a transobturator design, without any offsetting costs or risks. The plaintiffs' claim, in any event, was targeted at the Ethicon TVT in particular. See part III A of this opinion.

341 Conn. 535 FEBRUARY, 2022 609

Fajardo *v.* Boston Scientific Corp.

urgency, overactive bladder, vaginal erosion, and dyspa-
reunia. The detanged edges hinder the integration of
the sling with native tissue. The transobturator design
results in vaginal tenderness and groin pain, and may be
linked to tape extrusion, vaginal erosion, and internal
dyspareunia. Dyspareunia, pelvic pain and swelling, and
worsening incontinence are the very symptoms that
Fajardo alleged.

Second, the plaintiffs' expert witnesses were of the
opinion that these defective characteristics of the
Obtryx were in fact responsible for Fajardo's injuries.
Rosenzweig testified that the decision by Boston Scien-
tific to heat seal the middle portion of the Obtryx stiff-
ened the sling, which, in turn, aggravated Fajardo's
incontinence and exacerbated the foreign body reac-
tion, inflammation, scarring, and the other sequelae of
her condition. He opined that "Fajardo has . . .
chronic groin pain from the Obtryx sling . . . ." He
further noted that Fajardo's sling was palpable when
removed, consistent with the cautions contained in the
Ross study regarding the transobturator design, and
that her injuries were to her obturator foramen, which
was precisely where the Obtryx was inserted. Ulti-
mately, Rosenzweig unequivocally opined, to a reason-
able degree of medical certainty, that "[t]he defects of
the Obtryx sling caused the injuries to . . . Fajardo."[14]
The majority's statement to the contrary fails to acknow-
ledge the clear significance of this evidence.[15]

[14] Fajardo's treating physicians concurred with Rosenzweig that the Obtryx
was the cause of her injuries. Bercik testified that, to a reasonable degree
of medical certainty, the Obtryx had caused Fajardo's worsening inconti-
nence and dyspareunia. This was consistent with Hines' recommendation
to Fajardo that she have the mesh removed because it was "clearly . . .
what's causing her pain."

[15] As I previously noted, the majority contends that Rosenzweig's testi-
mony regarding the dangers created by these particular defects is of no force
because Rosenzweig also believed that the Obtryx was defective because
it contained polypropylene. The logic of this point escapes me. See part III
B of this opinion.

Fajardo *v.* Boston Scientific Corp.

Finally, the jury reasonably could have concluded, on this record, that using a TVT in lieu of the Obtryx would have reduced, if not avoided altogether, the risks of harm that the Obtryx presented.[16] Indeed, insofar as the primary design differences between the Obtryx and the TVT were also the precise defects alleged to have injured her, by far the most logical conclusion is that selecting a TVT would have reduced her risk of dyspareunia, groin pain, and incontinence, consistent with the medical studies in evidence.

As I previously discussed, it is well within the province of the jury to draw reasonable inferences from an expert's testimony and, thus, to come to a conclusion that it could not permissibly reach solely on the basis of lay knowledge. In the present case, the jury was at liberty to combine various elements of the expert evidence—Rosenzweig's testimony, the Tulikangas opinion letter, and the medical studies admitted as full exhibits[17]—to reach the reasonable conclusion that the

[16] The required showing should not be misunderstood. The plaintiff is not required to show that the alternative design would have avoided or reduced the plaintiff's injuries. The legal standard requires evidence only that the alternative design could avoid or reduce *the risk of harm* created by the defendant's product. See footnote 3 of this opinion. This is not a causation requirement but, rather, proof that a product is defective because an alternative would present a reduced risk of harm to a user or consumer. See, e.g., *Gardner* v. *Ethicon, Inc.*, Docket No. 4:20-cv-00067-SAL, 2020 WL 5077957, *4–5 (D.S.C. August 27, 2020) (rejecting defendant's argument that plaintiff was required "to connect the reasonable alternative design to her specific injuries" by presenting expert testimony that safer alternative design existed for defective products that would have prevented or reduced plaintiff's injuries, and holding that "the risk-utility test relates to the defectiveness of the design—not causation"); *Thompson* v. *Ethicon, Inc.*, supra, 2020 WL 3893253, *6 (rejecting "hypertechnical criticism" of plaintiff's expert testimony and holding that it was enough that expert established that device was defective and tied that defect to plaintiff's injuries); *Rheinfrank* v. *Abbott Laboratories, Inc.*, 137 F. Supp. 3d 1035, 1040–41 (S.D. Ohio 2015) (plaintiff need only establish that use of alternative design would reduce general risk of similar harm for similarly situated patients).

[17] I would also add to this list the testimony of Bercik, one of the physicians who treated Fajardo for her sling related injuries and ultimately removed the Obtryx. He testified that Fajardo could have been a candidate for the

Fajardo *v.* Boston Scientific Corp.

elimination of three specific dangerous features of the Obtryx would reduce the risk of danger presented by that product. See, e.g., *State* v. *Nunes*, 260 Conn. 649, 675, 800 A.2d 1160 (2002) (substance of experts' testimony was held sufficient to establish causation to reasonable degree of medical certainty, despite fact that experts merely stated that "the symptoms experienced by the victim were consistent with those of chloral hydrate" (emphasis omitted)); *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 725–26 (recognizing that expert opinion is required to prove causation in medical malpractice action but holding that jury could find causation from cumulative effect of expert testimony and other evidence, including circumstantial evidence); see also *Thompson* v. *Ethicon, Inc.*, supra, 2020 WL 3893253, *5 (applying same rule in context of mesh litigation). Because the plaintiffs had only to persuade the jury that use of the TVT would have reduced the risks posed by the Obtryx, establishing that the TVT posed a lower danger to Fajardo with respect to any one of the three suspect design features would have been sufficient to warrant a reasonable alternative design instruction. Construing the evidence in the light most favorable to the plaintiffs, as we must, there was sufficient evidence of all three defects to warrant such an instruction.[18]

TVT, that the Obtryx was the cause of her injuries, and that he had begun using the TVT in favor of transobturator slings, including the Obtryx, because of his negative experience with the latter. The majority offers a different interpretation of Bercik's opinion on this subject, on the basis of other testimony of his. See footnote 16 of the majority opinion. Rather than explaining why I read that testimony differently, it will suffice to say that the jury should have been allowed to choose which of Bercik's testimony to emphasize and whether Bercik's opinions ultimately supported the plaintiffs' claims.

[18] In rejecting this conclusion, the majority relies on generalities and truisms regarding the need for expert testimony in product design defect cases. See footnote 20 of the majority opinion. Those generic propositions are unhelpful here because the plaintiffs in this case presented extensive expert testimony and peer reviewed scientific research studies that permitted the jury to decide the case. The majority consistently states that expert testimony

Fajardo *v.* Boston Scientific Corp.

C

I have established that the plaintiffs were entitled to the requested instruction if there was evidence tending to show that a reasonable alternative design was available that would have avoided or reduced the risk of harm and the failure to use that alternative design rendered the product unreasonably dangerous. The plaintiffs claimed in particular that the unique characteristics of the Obtryx—a heat-sealed middle section, detanged edges, and a transobturator design—rendered it less safe than the TVT and that those differences caused or contributed to Fajardo's injuries. They contended that the TVT was a generally safe, effective, and widely used mesh sling product for the treatment of female stress urinary incontinence and that the Obtryx did not offer any significant advantages in safety or effectiveness vis-à-vis the "gold standard" TVT that would justify the increased rate of complications. They offered expert testimony, bolstered by respected clinical studies, in support of those contentions, and in support of the conclusion that the Obtryx should not be used due to its unnecessarily high rate of serious complications.

The claim as presented was not oblique or difficult to understand. The plaintiffs' counsel throughout trial directly and repeatedly referenced the foregoing body

is necessary to allow the jury to conclude that there is an alternative design that is feasible, which is sufficiently safer than the product at issue to render the latter defective, and that the use of that alternative design would have reduced the risk of the types of injuries suffered by the plaintiff. Once the experts and the research studies had demonstrated that there are three primary design features that distinguish the Obtryx from the TVT, that each of those three differences makes the Obtryx unnecessarily dangerous, that those features are defects that caused or contributed to Fajardo's injuries, and that the TVT was a viable alternative, it is unclear what more the majority believes the jury needed to hear from the experts before it could reasonably conclude that the TVT was a reasonable alternative design, the use of which would have reduced the risk of the injuries caused by the defective design of the Obtryx.

Fajardo *v.* Boston Scientific Corp.

of research suggesting that TVT slings are superior in design and feature a more favorable risk-benefit profile vis-à-vis transobturator slings in general, and the Obtryx in particular. In his closing argument, the plaintiffs' counsel began by discussing this body of research at some length and by emphasizing that the TVT had been proven to be a safer product than the Obtryx, with fewer complications, and, therefore, that it should remain the midurethral procedure of choice. He specifically linked the higher incidence of complications relative to TVT with the unique design features of the Obtryx, such as the detanged edges and heat-sealed mid-portion, and the resulting increase in material stiffness, as well as the Obtryx' transobturator approach. Later, counsel analogized the Obtryx to the Ford Pinto and its proclivity to burst into flames during rear-end collisions, explaining that evidence that mesh slings are generally safe was simply irrelevant to the plaintiffs' claim that the Obtryx is specifically dangerous.

Finally, in his rebuttal, the plaintiffs' counsel argued: "[A]lmost their whole defense was saying mesh slings are good. Very, very little of what they said had to do with the Obtryx. And they said that [the] plaintiffs are here telling you all mesh slings are bad. Those words never left my mouth once. I put a lot of evidence in front of you, but there's a feasible alternative called the TVT, which is superior. And that's just not my words, that's . . . Tulikangas who told them that, that their product is inferior." A few minutes later, he returned to this theme: "So, then [the defendants' counsel] tell[s] you how great TVT is, is a complete distraction and actually supports our claim that there is a better product that doesn't have near[ly] as many problems. And they were told that." He then closed with a final reference to the Ross study: "Here's the 2009 Ross study, and let's look at the last sentence. Use TVT, don't use the Obtryx. That's th[e] conclusion." The evidence of rea-

Fajardo *v.* Boston Scientific Corp.

sonable alternative design was presented at trial as a distinct theory of product defect, the claim was argued forcefully on the basis of that evidence, and the evidence was sufficient in all respects to allow the jury to exercise its constitutional function.[19]

## III

Despite the evidence discussed in part II of this opinion, and the requirement that we construe that evidence in the light most favorable to the plaintiffs, the majority remains unpersuaded that a reasonable alternative design instruction was appropriate, for four primary reasons. First, the majority contends that the TVT cannot qualify as a reasonable alternative design because the term "TVT," as used at trial, is ambiguous, and did not adequately identify one specific product brand. Second, the majority contends that the plaintiffs could not rely on the expert opinion of Rosenzweig to establish that

---

[19] I reject the majority's position that, although the plaintiffs (1) disclosed two experts who would testify as to safer alternatives to the Obtryx, (2) set forth abundant evidence of a reasonable alternative design, (3) referenced their "feasible alternative" theory during closing argument, and (4) requested a reasonable alternative design jury instruction, they nevertheless were not entitled to such an instruction because they "took a scattershot approach" to arguing the case. Part II E of the majority opinion. It is true that the plaintiffs and their various expert witnesses offered several different theories of liability: they argued that the TVT was a reasonable alternative design, that the Burch procedure is a better treatment option than vaginal mesh, and that polypropylene is ill-suited for use in medical devices. It is beyond dispute, however, that a plaintiff is free to present multiple alternative or even contradictory theories of liability to the jury and is entitled to an instruction on any of the theories for which there is minimally sufficient evidence to support a verdict. See, e.g., *Meribear Productions, Inc.* v. *Frank*, 328 Conn. 709, 722, 183 A.3d 1164 (2018) (" 'a party may plead, in good faith, inconsistent facts and theories' "); *Dreier* v. *Upjohn Co.*, 196 Conn. 242, 245, 492 A.2d 164 (1985) ("[u]nder our pleading practice, a plaintiff is permitted to advance alternative and even inconsistent theories of liability"). The question is not whether a reasonable alternative design was the plaintiffs' only or even principal theory of the case but, rather, whether there was sufficient evidence before the jury to warrant an instruction. The answer, quite clearly, in my view, is yes.

Fajardo *v.* Boston Scientific Corp.

the TVT represents a reasonable alternative design when Rosenzweig also opined that all polypropylene mesh products are unsafe. Third, the majority contends that the jury was precluded from considering published medical research studies, the testimony of treating physicians, and certain other testimony when evaluating whether the Obtryx was defectively designed. Fourth, the majority, having weighed the evidence presented at trial, finds that the evidence in support of the plaintiffs' reasonable alternative design theory was unpersuasive, lacked credibility, or was contradicted by other evidence of record. I consider each argument in turn.

A

The majority first argues that the TVT cannot qualify as a reasonable alternative design because the term "TVT" is ambiguous. The majority contends that "[t]he record demonstrates that the term 'TVT' is used both with respect to the Ethicon branded tension free vaginal tape (the specific TVT type product [Fajardo] identified in her complaint) and as a generic term for similar tension free vaginal tapes in the class of TVT products, such as Boston Scientific's Advantage tape. Unless otherwise noted, [the majority] use[s] the term in that broader, generic context. Although the plaintiffs juxtaposed the Obtryx to the class of TVT products generally, they did not focus on a particular TVT product with which to compare the Obtryx . . . ." Footnote 9 of the majority opinion. On the basis of this premise—which, as I will explain, is incorrect—the majority proceeds on the assumption that a plaintiff may not satisfy its burden of producing sufficient evidence of a reasonable alternative design by pointing to a class of products that themselves differ in material, design, safety and efficacy with some containing the very same defects of which the plaintiff complains. The majority proceeds to evaluate the expert testimony and other evidence presented by the plaintiffs through the lens of its errone-

Fajardo *v.* Boston Scientific Corp.

ous assumption that "the plaintiffs are claiming that the class of TVTs is a reasonable alternative design . . . ."[20] Part II E of the majority opinion.

The flaws in the majority's position become manifest upon careful review of its reasoning. The majority elaborates: "To the extent that the plaintiffs assert that they presented sufficient evidence that the TVT is a reasonable alternative design to the Obtryx, it appears —from the evidence on which they rely—that they must be referring to the class of tension free vaginal tape that is implanted in a retropubic fashion. First, Rosenzweig does not compare the Obtryx to the Ethicon branded TVT. Second, the Ross study did not compare the Obtryx to the Ethicon branded TVT but compared the Obtryx to another retropubic sling manufactured by Boston Scientific. Third, the other studies entered into evidence did not compare the Obtryx device to the Ethicon branded TVT. Finally . . . Bercik did not compare the Ethicon branded TVT to the Obtryx; he notes only that he and a few other physicians with whom he works prefer the Ethicon branded TVT to other slings but that one of his superiors in his working group at Yale School of Medicine still uses the Obtryx." (Citation omitted; footnotes omitted.) Part II E of the majority opinion. The majority also contends that, insofar as certain TVTs, such as Boston Scientific's own Advantage, have the same alleged design defects as the Obtryx—a heat-sealed, detanged center section—there is no evidence that use of the TVT would have prevented Fajardo's injuries.

The argument of the majority, in summary, relies on five propositions: (1) the term "TVT" can refer both to the Ethicon branded TVT and to the broader class of

---

[20] The majority points to nothing in the record suggesting that the trial court declined to give the requested instruction for this reason or even considered the issue.

341 Conn. 535 FEBRUARY, 2022 617

Fajardo *v.* Boston Scientific Corp.

retropubic slings; (2) the plaintiffs use the term in the latter, broader sense, not with reference to any particular sling product; (3) a class of products cannot qualify as a reasonable alternative design; (4) some members of the class of TVTs, most notably Boston Scientific's Advantage retropubic sling, have the same design features as, and are no safer than, the Obtryx; and (5) the plaintiffs, therefore, did not proffer sufficient evidence to warrant a reasonable alternative design instruction.[21]

I agree with the first proposition, that the term "TVT" can be ambiguous. The majority is simply mistaken, however, with respect to the latter three propositions. First, the vast majority of the evidence in the record, and the focal point of the plaintiffs' reasonable alternative design argument, addressed the original, Ethicon branded TVT, rather than a generic class of retropubic slings. Second, nothing in law or logic bars the plaintiffs from arguing that all TVT-type retropubic slings are superior to the Obtryx *and* that the original, Ethicon branded TVT is especially superior. And third, the plaintiffs presented compelling evidence that the Obtryx was less safe than both the Ethicon TVT and other TVT-type retropubic slings. Accordingly, the fact that the term "TVT" is occasionally used loosely, in the course of a ten day trial, to refer to retropubic slings generally is of no consequence; the trial court did not rely on that argument, and nothing about it justifies the court's instructional ruling.

---

[21] I might quibble as well with other assumptions underlying the majority's argument. Its claim, for example, that different TVTs are made from many different materials finds little, if any, support in the record. See part II E of the majority opinion. Indeed, the defense expert, Rosenblatt, testified that, although the *brands* of polypropylene used may vary, all synthetic slings are produced from type 1 microporous polypropylene and are "about the same" and "extremely similar." Certainly, the jury could have so concluded. But, for reasons of expediency, I will focus my attention on the most prominent flaws in the majority's argument.

Fajardo *v.* Boston Scientific Corp.

1

The majority incorrectly suggests that the plaintiffs never compared the Obtryx to any particular TVT product and that their references were only to the class of tension free tape that is implanted in a retropubic fashion. The truth is that, with just a handful of exceptions, all of the references to "TVT" in the record were expressly to the product that bears that name, the TVT-brand sling manufactured by the Gynecare unit of Johnson & Johnson's Ethicon division. This is no surprise. As the majority acknowledges, the plaintiffs identified one particular TVT product in their complaint, and only one—the Ethicon TVT. Indeed, unless my review of the record missed contrary evidence, Ethicon's is the *only* vaginal mesh that uses the trade name "TVT." In light of these facts, I do not understand why the majority resists the reasonable assumption that the Ethicon TVT is *the* TVT to which the plaintiffs were referring.

The cross-examination of one of the plaintiffs' experts at trial illustrates that everyone in the courtroom—including Boston Scientific's own lawyers—clearly understood that the TVT under discussion was the Ethicon TVT. Bercik testified, among other things, that Fajardo would have been a suitable candidate for the TVT. He repeatedly made clear that the TVT to which he was referring was the Ethicon TVT in particular, and not retropubic slings more generally. The following colloquies, for example, took place during his cross-examination.

"Q. And then you say [that Fajardo] may potentially benefit from repeat sling procedure, and what you left out when you read to the jury was the word TVT. You wrote TVT at the end of the sentence, right?

"A. I did.

Fajardo *v.* Boston Scientific Corp.

"Q. Okay. And so what you were reporting in your note is that . . . Fajardo might benefit from a repeat sling procedure, TVT, right? That's what you wrote?

\* \* \*

"Q. But a TVT is a polypropylene sling, right? It's made from polypropylene?

"A. So, it's a specific brand of a polypropylene sling.

"Q. Sir, my . . . question is [whether] the TVT is a polypropylene sling, right?

"A. Yes, sir.

"Q. *Okay. And it's also . . . made by Johnson & Johnson and not Boston Scientific, right*?

"A. *That's correct.*

"Q. *Ethicon. And you have implanted that polypropylene sling for many years. You talked . . . with . . . Fajardo's lawyers about that, right*?

"A. *Yes, sir.*

"Q. Okay. And you currently use and recommend that polypropylene sling to women with stress urinary incontinence, right?

"A. Yes, sir, I do.

"Q. And you place about 100 of those polypropylene midurethral slings a year, right?

"A. Give or take, yeah.

\* \* \*

"Q. Sure. . . . For the slings that . . . you have implanted . . . *the TVT sling manufactured by Johnson & Johnson*, those women [who] have that sling, there's a risk that their sling[s] may need to be removed?

"A. Oh, I see what you're saying. Yes.

Fajardo *v.* Boston Scientific Corp.

"Q. Yeah. And any time that you implant a TVT sling in the hundreds of women that you have recently, you discuss with them the potential that the sling may need to be removed as a potential risk, right?

"A. I do. I generally quote about a 1 percent risk.

"Q. All right. And you continue to recommend slings as an option for women to use despite the fact that there's a risk that they may need to be  .  .  . removed, correct?

"A. No, I don't—I don't recommend slings, plural. I recommend a sling, a specific sling.

"Q. You recommend a specific sling, the one that you choose to use, even with a risk of potential removal, correct?

"A. Right. Based [on] my experience and my knowledge of—of the risk and complication rates, yes.

"Q. And you also agree that, [with] the sling that you recommend, there is a risk of contracture with that sling, as well, agreed?

"A.  .  .  . With my experience, I have not seen significant contracture with that sling." (Emphasis added.)

The following additional colloquies took place on redirect examination.

"Q. [I]s *TVT made by the same manufacturer as the Obtryx sling*?

"A. *No, ma'am.*

"Q. *Okay.*

"A. *Different company.*

* * *

"Q. *Okay. So the TVT that you use has a different approach than the Obtryx sling. Correct*?

Fajardo *v.* Boston Scientific Corp.

"A. *Yes, ma'am.*" (Emphasis added.)

It could not be any clearer that Fajardo's treating physician was comparing the Ethicon TVT to the Obtryx.[22] He opined that the Ethicon sling was a suitable alternative for Fajardo specifically. He opined that the Ethicon sling was safer than the Obtryx in various respects, with fewer complications, less contraction, and less risk of removal. He went out of his way to emphasize that he was recommending only one particular sling, sold by one particular company. And both the plaintiffs' and the defendants' counsel repeatedly indicated that they understood that the sling at issue was the Ethicon TVT, not a general class of retropubic slings or Boston Scientific's own retropubic Advantage sling. It is impossible to read the record any other way.

Other key testimony at trial would have reinforced the fact that the term "TVT" is primarily used in reference to the Ethicon branded TVT, and not to a class of TVT-like products. Rosenblatt, the primary defense expert, testified that the first mesh sling was the TVT, which was developed in 1998. He referred to it as the "Ethicon TVT," and he explained that, unlike Boston Scientific's vaginal slings, the TVT was manufactured from Prolex branded polypropylene, rather than Marlex. Indeed, Rosenblatt repeatedly distinguished "the TVT" from "TVT-like retropubic slings," such as Boston Scientific's Advantage, making perfectly clear that he was not using the term "TVT" broadly to encompass all retropubic slings. Notably, he emphasized that the TVT—unlike the Advantage and the Obtryx—does not

_____

[22] Despite the majority's statement to the contrary; see footnote 16 of the majority opinion; Bercik did compare the Ethicon TVT to the Obtryx. He indicated that he had tried using the Obtryx, which employs a transobturator approach, had a negative experience with it, and so began using the Ethicon TVT, which uses a different approach. This comparative testimony was not dwelled on at any length, but it is part of the trial transcript, and it was for the jury to determine its persuasiveness.

Fajardo *v.* Boston Scientific Corp.

have the controversial detanged edges, which, he explained, is a novel development and is unique to the Boston Scientific products.[23]

In addition, Rao, the Boston Scientific engineer, distinguished the Advantage from the Ethicon branded TVT, making clear that the TVT, unlike Boston Scientific's products, did not have the heat-sealed center, detanged edges, and other design flaws alleged to have caused Fajardo's injuries.[24] I am not aware of any trial

---

[23] Rosenzweig was operating on the same premise, using "the TVT" as synonymous with the Ethicon branded TVT. When asked whether he "recall[ed] what the first sling—transvaginal sling, or through the vagina . . . was called," he responded, "[t]he TVT."

[24] Rao was examined as follows:

"Q. So, can you tell me how the Advantage project—[how] you came to work on that project?

"A. Well, the project started before I was assigned to work on it. And I was assigned to help to develop a mesh that was very similar to the TVT mesh that was currently on the market.

"Q. And what were your duties as assigned to the Advantage mesh project?

"A. To characterize the TVT mesh so we understood its structure and understood what it was made of and to find a manufacturer that could make a comparable mesh product that we could then test and see if it was indeed similar to the TVT mesh, and also to look for ways to improve [on] the existing TVT mesh that was in the field.

\* \* \*

"A. I'm not 100 percent sure. I know that, by the time I joined, we knew that the TVT mesh was made from polypropylene, and we also knew that we, Boston Scientific, had a polypropylene mesh on the market made from the same—that could be used to knit the structure that we wanted for the Advantage mesh.

\* \* \*

"Q. Okay. Now, can you describe to me your responsibilities as technical team leader for the mesh?

"A. So, my responsibility was to figure out how to make a mesh that was similar, if not better, than the TVT mesh. So, we needed to figure out what the TVT mesh was made [of], what its properties were, what its structure was, and then find a vendor that could knit and heat-set the mesh.

\* \* \*

"Q. Okay. What changes did you-all actually make to the Advantage mesh to differentiate your product from [the] TVT?

"A. So we detanged the section that would go under the urethra. If I can explain that, when you cut a knit structure, there [are] little fibers that stick out [of] the edges. We smooth those fibers through a heat process so that

Fajardo *v.* Boston Scientific Corp.

testimony, by contrast, that suggested that the TVT that was held up as an alternative to the Obtryx represented a class of products.

Most of the exhibits introduced at trial likewise used the term "TVT" in reference to the Ethicon branded product of that name, rather than as a synonym for retropubic slings generally; many expressly distinguished Boston Scientific's Advantage retropubic sling from *the* TVT. The Lim study, for example, distinguished the Advantage from the "Gynecare" TVT and postulated that the defects in the former result from the heat sealing process, which renders the Advantage stiffer and less elastic than the TVT. See Y. Lim et al., supra, 21 International Urogynecology J. 1157, 1161. Moalli compared the "Gynecare TVT™" from Ethicon with the Advantage and four other midurethral slings. See P. Moalli et al., supra, 19 International. Urogynecology J. 655. The authors stated that the Gynecare TVT, which has unique tensile properties, is "the gold standard"; id., 656; and explained how newer slings, such as the Advantage, depart from the TVT by adding a heat-sealed middle, a tensioning suture, or a different weave pattern. See id., 662. Another study in evidence likewise distinguished the TVT from subsequent retropubic slings such as Advantage. See generally T. Tarcan et al., "Safety and Efficacy of Retropubic or Transobturator Midurethral Slings in a Randomized Cohort of Turkish Women," 93 Urologia Internationalis 449 (2014).

they wouldn't be as kind of prickly to the tissue. And we also made sure that we cut our mesh very straight.

\* \* \*

"Q. Did Boston Scientific, during the development of the Advantage mesh, do testing on the TVT product?

"A. Yes, we did.

\* \* \*

"Q. Your role, as you indicated earlier, was to basically try to develop a mesh that was substantially similar to the TVT mesh, right?

"A. Yes."

Fajardo *v.* Boston Scientific Corp.

In other trial exhibits, physician consultants to Boston Scientific also used the term "TVT" to specifically reference the Ethicon product. In an e-mail, one consultant, Joseph Macaluso, referred to the "TVT™," distinguishing the actual trademarked TVT from what he refers to as "TVT-type" mesh. Similarly, in his correspondence with Boston Scientific, Tulikangas responded to an e-mail from Boston Scientific, stating: "Advantage vs TVT—Longer term follow-up—Retrospective—Multiple Institutions—Shows that [Advantage] is just as effective as TVT . . . ."[25] Indeed, of the scores of exhibits in evidence, only one, the Ross study, consistently used the terms "TVT" and "retropubic" interchangeably. See generally S. Ross et al., supra, 114 Obstetrics & Gynecology 1287.

In most instances, it also was apparent that counsel for both sides, when referencing the "TVT," were referring to the Ethicon product in particular. As the majority concedes, all of the plaintiffs' references to "TVT" in the operative complaint expressly referenced Ethicon's original, branded TVT. See footnote 9 of the majority opinion. In his closing argument, the plaintiffs' counsel identified the TVT as "a competitor's product," which eliminates any possibility that he was referencing the class of TVTs that includes Boston Scientific's Advantage sling. In support of his claim that the TVT is a superior product for which Fajardo would have been well suited, he discussed the Moalli study and the testimony of Bercik, both of which addressed the Ethicon TVT, in particular. Counsel explained how "the TVT people," unlike Boston Scientific, designed the TVT with tanged edges "for a functional purpose to grip

[25] In addition, plaintiffs' exhibit 86, a review of mesh testing data by John Lehmann, identifies the TVT tested as "Gynecare" and states that "[t]he TVT device has a significant clinical record of success . . . ." Plaintiffs' exhibit 87, another study conducted by another Boston Scientific consultant, likewise identifies "the commercially available TVT device" with Gynecare.

Fajardo *v.* Boston Scientific Corp.

tissue.'' Although counsel's other references to TVT, such as in the context of discussing the Ross study, were arguably ambiguous, at no point did he suggest that the TVT that he was holding up as a comparator was the class of retropubic slings, much less Boston Scientific's own Advantage product.

We can be certain that Boston Scientific was not confused by the supposed ambiguity. In its closing, Boston Scientific continued to hew to the position that it took throughout the trial, namely, that the TVT is a particular product rather than a class. Counsel walked the jury through the historical use of polypropylene in medical devices: ''You then have the first product that comes onto the market in 1998, and that's called, you've heard, the TVT. It's a polypropylene mesh sling. Five years later, Boston Scientific puts out its first polypropylene mesh sling called the Advantage . . . .''

The majority cites no examples of any instance at trial when Boston Scientific uses the term ''TVT'' to refer to a class of products. Indeed, even on appeal, the defendants themselves have not taken the position espoused by the majority that the term ''TVT'' was used at trial in reference to the class of retropubic slings. In its brief, Boston Scientific repeatedly distinguishes ''the TVT,'' which was ''first . . . marketed in 1998'' and ''lacks detanged edges,'' from retropubic slings such as the Advantage. Although Boston Scientific does fault the plaintiffs for not identifying a competitor product that, in its view, ''would have reduced or avoided the risk of harm to . . . Fajardo,'' it is perfectly clear from its brief that Boston Scientific understands that the Ethicon TVT is among the reasonable alternative designs at issue. (Emphasis omitted.)

It is clear, then, that there was abundant evidence from which the jury reasonably could have found that the original TVT, the branded product manufactured

Fajardo *v.* Boston Scientific Corp.

and sold by the Gynecare unit of Johnson & Johnson's Ethicon division, represented a reasonable alternative to the Obtryx. Expert testimony and supporting scientific studies established that that particular sling (1) is widely used, (2) is safe and effective, (3) was a feasible option for Fajardo, (4) is superior to the Obtryx, and (5) does not have the design features that allegedly caused Fajardo's injuries, namely, a heat-sealed middle section, detanged edges, and a transobturator approach. If there are concerns that the jury might have been confused by Ross' looser use of the term "TVT," or ambiguities in the arguments of counsel, then the trial court could have solved the problem by instructing the jury to consider only the evidence tending to show that the Ethicon TVT in particular represented a reasonable alternative design. There was no justification for throwing out the entire claim.

2

Even were we to assume, purely for the sake of argument, that the plaintiffs intended the "TVT" to refer to a class of products rather than a particular product, the majority has provided neither authority nor argument in support of its contention that a class of products cannot serve as a reasonable alternative design. A consumer injured by a cigarette lighter using a novel ignition device would be entirely justified in holding up the class of disposable butane lighters using a flint wheel as a reasonable alternative design, rather than, say, arbitrarily pointing to some particular BIC or Scripto model. As one federal court in Connecticut has explained, "proof of a feasible alternative design [is] a euphemism for avoidability . . . ." (Internal quotation marks omitted.) *Mals* v. *Smith & Nephew, Inc.*, Docket No. 3:19-cv-01770 (VLB), 2020 WL 3270835, *5 (D. Conn. June 17, 2020). If the defendant's product differs in some important way from all competitor products, and in a way that is demonstrably responsible for the plain-

Fajardo *v.* Boston Scientific Corp.

tiff's injuries, then why should it matter that those various, safer alternatives are not in every respect identical?

In the present case, *every* sling in the class of TVT-type products lacks at least one of the three defects of the Obtryx, namely, the use of a transobturator rather than a retropubic design. Evidence in the record that was introduced and relied on by the plaintiffs' design experts and emphasized by the plaintiffs' counsel during both opening and closing arguments, such as the Ross and Cholhan studies, as well as other evidence, such as the Petri study; see footnote 8 of this opinion; indicated that the use of a transobturator approach was a defect of the Obtryx that is associated with injuries of the type suffered by Fajardo. Rosenzweig clearly summarized this body of research for the jury, stating that, because the transobturator design of the Obtryx was associated with significantly higher incidences of groin pain and other complications, "the retropubic sling is better than the [Obtryx] transobturator sling." He summed up his discussion of these and other complications associated with the Obtryx by opining that the Obtryx is defective and that its defects caused Fajardo's injuries. Accordingly, even if the majority were correct that the plaintiffs tried the case by comparing the Obtryx only to the class of retropubic slings, rather than to the Ethicon TVT in particular, there was abundant evidence from which the jury could have found that the use of any retropubic sling would have reduced the risk of the types of injuries that Fajardo suffered.

To summarize, the plaintiffs demonstrated at trial that both of the Boston Scientific products, the Advantage and the Obtryx, are inferior to the Ethicon TVT insofar as they have two unique design elements: detanged edges and a heat-sealed middle section. The plaintiffs also demonstrated that the Obtryx is worse even than the Advantage, insofar as the former sling has a third design defect: transobturator slings are more

Fajardo *v.* Boston Scientific Corp.

dangerous than retropubic slings, without offsetting benefits. So, the Obtryx is the worst of both worlds. Fajardo would have reduced her risks had she used any TVT-style retropubic sling, and she would have minimized her risks to the greatest extent by using the Ethicon TVT, rather than a heat-sealed, detanged Boston Scientific TVT product. However defined, TVT was a safer product, a less defective, reasonable alternative design. At least, the jury could have so found. It should have been allowed to do so.

B

The second reason that the majority believes that a reasonable alternative design instruction was not warranted, despite the abundant evidence that the TVT was a viable, superior alternative that could have prevented Fajardo's injuries, is that the plaintiffs also presented some evidence that *all* polypropylene slings are unreasonably dangerous because polypropylene is not suitable for use in the human body. Specifically, the majority embraces Boston Scientific's principal argument— the same argument that apparently persuaded the trial court—that the plaintiffs could not, as a matter of law, have established that the TVT is a reasonable alternative design because their own product design expert, Rosenzweig, testified that, in his opinion, all mesh products fabricated from polypropylene, including the TVT, are unsafe and unsuitable for implantation in the human body. The plaintiffs counter, and I agree, that the fact that Rosenzweig was of the view that all polypropylene mesh products are unsafe does not mean that the jury was precluded from finding that the TVT represents a reasonable alternative design to the Obtryx sling. I reach this conclusion for several reasons.

1

As I explained in part I of this opinion, the jury was not confined to the binary choice of either crediting all

Fajardo *v.* Boston Scientific Corp.

of Rosenzweig's opinions or rejecting them whole hog. Our law governing expert witnesses is very clear on this point. The jurors were free to credit Rosenzweig's opinion that the unique features of the Obtryx—a heat-sealed center, detanged edges, and a transobturator approach—constituted design flaws that caused or contributed to Fajardo's injuries, while at the same time rejecting his more idiosyncratic view that all polypropylene mesh products are defective and, instead, crediting the trial testimony of other experts that polypropylene *is* a suitable material for use in medical implants and that the TVT is a safe and effective treatment for female stress urinary incontinence. Indeed, the trial court instructed the jury to that effect immediately before Rosenzweig testified.

Rosenzweig himself provided ample basis for the jury to disregard his more extreme views regarding the dangers of polypropylene. Although Rosenzweig's own opinion was that polypropylene is not a suitable material for medical implants and that the alternative Burch procedure is a preferable means of treating stress urinary incontinence, he also repeatedly acknowledged at trial that those views do not represent the prevailing opinion among urogynecologists and, indeed, are well outside the medical mainstream. For example, Rosenzweig testified that, according to the medical literature, polypropylene mesh is the "gold standard" for treating stress incontinence and that its use has been endorsed as safe and effective by every major urological association. He agreed with the defendants' counsel that polypropylene has been used in the human body for more than fifty years in millions of patients, that polypropylene slings such as the TVT are effective and widely used, and that physicians who use them do so reasonably and consistent with the prevailing standard of care. Rosenzweig acknowledged that his own colleagues at Rush University Medical Center regularly use such

Fajardo *v.* Boston Scientific Corp.

slings and continue to train residents in the use thereof. In short, he agreed that polypropylene slings represent the most commonly used modality for treating stress urinary incontinence and that their use is supported by extensive medical data, including more than 2000 studies.

Accordingly, the jury reasonably could have credited Rosenzweig's testimony that the unique design characteristics of the Obtryx render it especially dangerous and contributed to Fajardo's injuries while simultaneously concluding that Rosenzweig is an outlier with respect to his strident opposition to any medical use of polypropylene. The jury could have credited the testimony of various other witnesses—such as Bercik, Rosenblatt, and Boston Scientific's biomaterials expert, Stephen Badylak—that polypropylene, such as that used in the TVT, is a generally safe material that is widely used for the fabrication of medical implants and accepted by all major medical associations.

2

Another reason that Rosenzweig's beliefs regarding the dangers associated with polypropylene did not fatally taint his entire testimony is that I do not accept Boston Scientific's view, apparently shared by the majority, that an alternative product design that is unsafe, but significantly less so than the defendant's product design, cannot, ipso facto, be a *reasonable* design. It is noteworthy that neither Boston Scientific nor the majority has identified a single authority for the theory that a federally regulated product that is legally on the market and in widespread use cannot qualify as a reasonable alternative design if it is safer than the product at issue but, nevertheless, poses safety risks that arguably outweigh its advantages. Rather, the few courts and commentators to have considered the issue uniformly have concluded that a less unsafe prod-

Fajardo *v.* Boston Scientific Corp.

uct can qualify as a reasonable alternative design if that product lacks the features that caused or contributed to the plaintiff's injuries. Indeed, several federal courts have reached that very conclusion in the multidistrict vaginal mesh litigation, rejecting similar arguments. See, e.g., *Herrera-Nevarez by Springer* v. *Ethicon, Inc.*, Docket No. 17 C 3930, 2017 WL 3381718, *7 (N.D. Ill. August 6, 2017) ("the fact that [an expert] evidently does not believe that any such devices are safe does not preclude him from ranking them on a comparative basis"); *Kaiser* v. *Johnson & Johnson*, Docket No. 2:17-CV-114-PPS, 2018 WL 739871, *7 (N.D. Ind. February 7, 2018) (similar); *Wiltgen* v. *Ethicon, Inc.*, Docket No. 12-cv-2400, 2017 WL 4467455, *5 (N.D. Ill. October 6, 2017) (similar); see also *Campbell* v. *Boston Scientific Corp.*, 882 F.3d 70, 79 (4th Cir. 2018) (rejecting argument that Rosenzweig's testimony did not support finding of reasonable alternative design).

Although those courts did not elaborate on the reasoning underlying their rulings, legal scholars have made a persuasive case. For example, Professor Douglas A. Kysar has explained that "even an unavoidably unsafe product sometimes can be made marginally less unsafe. By allowing courts to balance the risks and rewards posed by alternative product designs, the risk-utility test provides manufacturers with incentives to constantly evaluate and [to] adopt such reasonable alternative designs." D. Kysar, "The Expectations of Consumers," 103 Colum. L. Rev. 1700, 1717 (2003). The Restatement (Third) is of the same view: "The requirement . . . that the plaintiff show a reasonable alternative design applies in most instances even though the plaintiff alleges that the category of product sold by the defendant is so dangerous that it should not have been marketed at all. . . . [This applies to] [c]ommon and widely distributed products such as alcoholic beverages, firearms, and [aboveground] swimming pools

Fajardo *v.* Boston Scientific Corp.

. . . .'' (Citation omitted.) Restatement (Third), supra,
§ 2, comment (d), p. 20.

Consider the hypothetical of a tobacco company that
develops a cigarette featuring a novel design that, while
more stylish in appearance than those currently on the
market, has a less effective filter that removes fewer
carcinogens. A cigarette design expert might well testify
that the new product is unnecessarily dangerous rela-
tive to traditional designs, which are less likely to cause
cancer, while also acknowledging that she would never
smoke or allow her children to smoke and that she is
of the view that no cigarettes should be legal due to
the well-known medical risks associated with smoking.
Of course, cigarettes are legal. They are heavily regu-
lated, but society has accepted that the health and finan-
cial costs associated with smoking related illnesses are
justified by the economic benefits and the rights of
adults to make their own determination that the plea-
sure that they derive from smoking outweighs the risks.

Moreover, this in for a penny, in for a pound theory
of product liability is especially poorly suited to the
medical device field. The parties, and all of the experts
who testified at trial, agreed that every surgical inter-
vention and every internally implanted medical device
carry some potentially serious risks. Much of the prac-
tice of Western medicine involves the process of
attempting to identify and quantify such relative risks
so that clinicians and patients can make informed deci-
sions as to whether the dangers associated with a partic-
ular intervention are justified by the potential benefits.
As is clear from the present case, medical experts no
less than their patients reasonably may reach different
conclusions about whether, for example, it is prudent
to implant a particular medical device that has a reason-
able likelihood of curing an irksome but nonlethal con-
dition, such as chronic stress urinary incontinence, but
that also has the potential to cause serious pain and

Fajardo *v.* Boston Scientific Corp.

other side effects. So long as that device falls within
the standard of care and is deemed to have some medi-
cal utility, I see no reason why the law should not
incentivize manufacturers to minimize those risks,
rather than pile risk upon risk, to the extent reasonably
possible. The majority's holding in the present case
removes that incentive and potentially disincentivizes
manufacturers of certain categories of products from
developing design innovations that reduce the risk of
harm.

3

Finally, the majority ignores the fact that this court
already has, in essence, decided this very question in
the plaintiffs' favor. In *Bifolck*, we made clear that a
plaintiff is not precluded from arguing that a class of
products is inherently, manifestly unsafe while, in the
alternative, also contending that the particular product
at issue could have been designed to be less unsafe.
See *Bifolck* v. *Philip Morris, Inc.*, supra, 324 Conn. 435
("Although the fact finder considers under either theory
whether the risk of danger inherent in the challenged
design outweighs the benefits of that design, these theo-
ries are not mutually exclusive. A plaintiff may consis-
tently allege that a product had excessive preventable
danger (reasonable alternative design) and that the
product was too dangerous to market to the consumer
irrespective of whether it could have been designed
to be safer (manifestly unreasonable design)."). The
majority does not appear to recognize that its holding
in the present case deviates from the court's guidance
in *Bifolck* and offers no rationale for this departure.

C

Third, as I have alluded to throughout this opinion,
I am troubled by the majority's view that the only evi-
dence that the jury was permitted to consider in
assessing a potential reasonable alternative design

Fajardo *v.* Boston Scientific Corp.

claim was the testimony of the plaintiffs' primary product design expert, Rosenzweig, and that the plaintiffs' case was not established unless Rosenzweig himself recited the talismanic words that the Ethicon TVT was a reasonable alternative design, use of which would have averted or reduced the risk of harm to Fajardo. This idea, that a jury in a product liability lawsuit is permitted to consider only a limited category of expert testimony regarding the design of medical devices and cannot take into account and draw reasonable inferences from other relevant expert evidence, such as scientific and medical studies and the testimony of treating physicians, even when that evidence was admitted without objection or limitation, is flatly inconsistent with established law. This aspect of the majority opinion encroaches on the autonomy of the jury and overlooks the realities of how expert witnesses are actually used, especially in complex civil cases.[26]

First, no one is arguing that expert testimony was not required in this case. The plaintiffs presented the testimony of a product design expert, Rosenzweig, whom they disclosed as an expert on safer alternatives to the Obtryx, and whom the trial court permitted to testify, over the objection of Boston Scientific. The plaintiffs also disclosed and presented the expert testimony of Richard W. Trepeta, a pathologist, who testified as to the material condition of the Obtryx that was implanted in Fajardo. As I previously discussed, Rosenzweig testified as to the design flaws in the Obtryx—

_____
[26] In complex civil cases such as medical malpractice actions, it is not at all uncommon for plaintiffs to prove their case through the combined testimony of various experts and treating physicians. See, e.g., *Mather* v. *Griffin Hospital*, 207 Conn. 125, 136, 540 A.2d 666 (1988) (holding that causation was adequately established and that deficiencies in testimony of plaintiffs' primary expert were filled by testimony of other experts and hospital staff). To impose an artificial requirement that one single expert make one pronouncement that explicitly establishes breach and causation is legally groundless and could potentially wreak havoc on litigation of this sort.

Fajardo *v.* Boston Scientific Corp.

heat sealing, detanging, a transobturator insertion— relative to the TVT, and he linked those differences to Fajardo's poor outcome. Although the majority worries that the jury was incapable of understanding the medical studies in evidence, contending that "the jury [did] not have the assistance necessary to reach an intelligent or correct decision''; footnote 20 of the majority opinion; the reality is that Rosenzweig made it about as basic as one can: "[T]he retropubic sling is better than the [Obtryx] transobturator sling.''

For its part, Boston Scientific disclosed and presented experts of its own, some of whom verified that the TVT is the most well established vaginal sling and that the primary differences between the TVT and the Obtryx are the latter's heat-sealed middle, detanged edges, and transobturator approach.

As discussed, the plaintiffs also introduced the expert opinions of Fajardo's treating physicians via the testimony of Bercik, whom the plaintiffs also disclosed as an expert on product design and reasonable alternatives to the Obtryx, and the office notes of Hines. The expert opinion of a third physician, Tulikangas, was before the jury, as well. It is well established that a plaintiff's treating physicians may provide expert testimony within their realm of practice, without the need for formal expert certification or detailed disclosures. See Practice Book § 13-4 (b) (2) (defining expert disclosure requirements for treating physicians). Moreover, even physicians who are not formal product design experts may provide relevant testimony as to elements of product design to the extent that there is overlap with their professional experience. See, e.g., *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 723 (causation testimony of physician disclosed as standard of care expert constituted " 'expert' " testimony, insofar as it reflected his medical expertise and experience, and, once admitted without objection or limita-

Fajardo *v.* Boston Scientific Corp.

tion, was before jury to use for any purpose); see also *Allen* v. *C. R. Bard, Inc.*, Docket No. 11-cv-2031-LRR, 2017 WL 4127765, *2 (N.D. Iowa September 15, 2017) (treating physician may opine that product feature caused patient's injuries without offering improper opinion as to design defect). Indeed, courts in other vaginal mesh cases have concluded that surgeons who perform mesh removal procedures may thereby be qualified to opine as to the design of such devices. See, e.g., *Heatherly* v. *Boston Scientific Corp.*, Docket No. 2:13-cv-00702, 2018 WL 3797507, *4, *9 (S.D. W. Va. August 9, 2018).

So, the question is not whether expert testimony is normally required in a product liability action involving a medical device. Nor is there any question that the plaintiffs had to supply expert evidence to demonstrate that Fajardo's injuries were likely caused by certain defective design features of Boston Scientific's product and that there is some reasonable alternative design that is economically and technically feasible, use of which would have reduced the risk of harm to end-users, including Fajardo. The question, rather, is whether that evidence was required to take a very particular form. As I discussed in part I of this opinion, the majority has not pointed to any authority in support of its position that the plaintiffs' proof cannot be forged from the combined testimony of different design and materials experts, treating physicians, scientific studies, and other evidence of record, both direct and circumstantial. Nor is there some magic words requirement that an expert express his or her opinion using the precise legal jargon that an appellate court might employ. See, e.g., *State* v. *Nunes*, supra, 260 Conn. 672–73; *Struckman* v. *Burns*, 205 Conn. 542, 555, 534 A.2d 888 (1987). Truly complex design questions plainly require the testimony of design experts. The cases cited by the

Fajardo *v.* Boston Scientific Corp.

majority say no more, no less.[27] But expert testimony is required when, and only when, the specific point to be established cannot be ascertained by a lay jury. Expert testimony must not be fetishized to the point where it

_____

[27] Although the majority cites various cases—most of them from Iowa—regarding the need for expert testimony, none of those cases supports the position taken by the majority, which is that, in a case such as this, one single designated product design expert must testify clearly and unequivocally as to every element of the plaintiff's claim and every step in the logical process. Rather, the cited cases qualify the need for expert testimony in all sorts of ways and largely stand only for the unremarkable proposition that *some* expert testimony is necessary to establish *some* elements of *most* product design defect cases. See, e.g., *Water Pollution Control Authority* v. *Flowserve US, Inc.*, 782 Fed. Appx. 9, 15 (2d Cir. 2019) ("expert knowledge is *often* required in such circumstances" and holding that expert testimony was required as to specific technical aspects of plaintiff's particular claim (emphasis added)); *Willet* v. *Johnson & Johnson*, 465 F. Supp. 3d 895, 905 (S.D. Iowa 2020) ("Whether expert testimony is required ultimately depends on whether it is a fact issue upon which the jury needs assistance to reach an intelligent or correct decision. . . . Although Iowa law does not appear to require expert testimony for recovery in a products liability action, the plaintiff must supply sufficient evidence to satisfy the trial court that the jury, with its common knowledge, could reasonably find an alternative design to be practicable and feasible." (Citations omitted; internal quotation marks omitted.)); *Neilson* v. *Whirlpool Corp.*, Docket No. 3:10-cv-00140-JAJ-RAW, 2012 WL 13018693, *11 (S.D. Iowa January 3, 2012) ("An average juror has no understanding as to the actual design of the Whirlpool washer or any alternative designs which might reduce the risk of foreseeable harm. This is the exact type of case in which a jury needs assistance to reach an intelligent or correct decision. . . . Design defect cases *sometimes* involve technical, scientific issues which cannot be *fully* understood by the average juror without *some* expert assistance . . . ." (Emphasis added; internal quotation marks omitted.)); *Benedict* v. *Zimmer, Inc.*, 405 F. Supp. 2d 1026, 1032–33 (N.D. Iowa 2005) ("Although the . . . Restatement (Third) does not require expert testimony in every case, the plaintiff must rely on expert testimony in *many* cases. . . . Expert testimony as to the existence of a design defect is not required when the feasibility of a reasonable alternative design is obvious and understandable to laypersons. . . . Whether the device had a design defect, whether the foreseeable risks of harm the device posed could have been reduced or avoided by the adoption of a reasonable alternative design and whether the omission of such design rendered the device not reasonably safe are technical, scientific issues that cannot be *fully* understood by the average juror without *some* expert assistance." (Citations omitted; emphasis added.)). Critically, in each of these cases relied on by the majority, the plaintiffs had provided *no* admissible expert testimony whatsoever, and, so, unlike in the present case, the question before the court was simply whether the jury could identify a product defect and/or a reasonable alternative design without any expert assistance.

Fajardo *v.* Boston Scientific Corp.

replaces our trust in the jurors' native intelligence and good sense.

Moreover, once the opinion testimony of a purported expert has been admitted without objection or limitation, it becomes part of the trial record, and it is inappropriate for either the trial court or this court to determine that it is off-limits for purposes of assessing the sufficiency of the evidence or an instructional request simply because that court, in hindsight, questions whether the witness was a proper expert, or the right species of expert. See, e.g., *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994) ("If [inadmissible] evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of the rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. . . . This principle is almost universally accepted. . . . The principle applies to any ground of incompetency under the exclusionary rules . . . [including] the expertness qualification." (Internal quotation marks omitted.)); *Maurice* v. *Chester Housing Associates Ltd. Partnership*, 189 Conn. App. 754, 759 n.2, 208 A.3d 691 (2019) ("We note that it is not necessary for a party to ask that the court recognize the witness as an expert before asking the witness to provide an opinion. . . . The proponent of the expert simply must lay the necessary foundation before asking the witness a question that calls for an expert opinion. If there is no objection to the question, the witness may give the opinion. If there is an objection to the witness' qualifications or to whether the witness' testimony will assist the trier of fact, the court can then rule on the objection in the context of the specific questions asked." (Citation omitted.)).

The same principles apply with respect to research studies published in scientific and medical journals. The majority has failed to identify any authority indicat-

Fajardo *v.* Boston Scientific Corp.

ing that, once a study has been admitted into evidence without objection or limitation, supported by the foundational testimony of an expert that the study is authoritative and that he or she relied on it in forming his or her opinions, the jury is barred from reading the study and drawing all reasonable conclusions therefrom. The studies at issue were admitted into evidence as full exhibits, without limitation. They contain statements of fact and opinion that the jury was entitled to consider as if the entire article had been read into the record verbatim. See Conn. Code Evid. § 8-3 (8);[28] see also, e.g., *Curran* v. *Kroll*, supra, 303 Conn. 864 ("Th[e] evidence was admitted in full, without limitation. In the absence of any limiting instruction, the jury was entitled to draw any inferences from the evidence that it reasonably would support."); *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 724 ("[i]n the absence of any [limiting] instruction from the court, the evidence . . . was before the jury for it to use for any purpose").[29]

If the defendants wanted to limit the jury's consideration to certain portions of the articles, or wished to limit the jury's use of the contents of the articles, they should have asked to have the articles redacted or

[28] Section 8-3 (8) of the Connecticut Code of Evidence provides: "To the extent called to the attention of an expert witness on cross-examination or relied on by the expert witness in direct examination, a statement contained in a published treatise, periodical or pamphlet on a subject of history, medicine, or other science or art, recognized as a standard authority in the field by the witness, other expert witness or judicial notice [is not excluded by the hearsay rule]."

[29] The Appellate Court discussed this principle at some length in *Procaccini*, explaining how, even if expert evidence is offered strictly for one specific purpose, once it has been admitted in full, the jury may use it for any purpose. The onus is on the opposing party to seek a limiting instruction or otherwise object. See *Procaccini* v. *Lawrence + Memorial Hospital, Inc.*, supra, 175 Conn. App. 714–15, 723–24. The majority offers no reason why the same principle should not apply in the present case.

Fajardo *v.* Boston Scientific Corp.

requested a limiting instruction.[30] See, e.g., *Filippelli* v. *Saint Mary's Hospital*, 319 Conn. 113, 135–36, 124 A.3d 501 (2015). They did not do so, and it is inconceivable to me that an appellate tribunal can now retroactively deem portions of those articles to be off-limits, or otherwise preclude the jury from using the contents of the articles to reach any conclusions supported by them, regardless of whether supplemented by expert testimony. If the defendants believed that the opinions contained in the articles required explanation, they had their opportunity to pursue that line of examination through witnesses at trial.[31]

Insofar as the trial court overlooked or opted not to consider any of this evidence, and restricted its consideration of the plaintiffs' requested charge to the universe of Rosenzweig's testimony,[32] that represents a legal error, rather than a factual finding to which we

[30] Similarly, if a party objects and the trial court is concerned that the jury would be confused or misled by examining the materials unaided by expert testimony, the court may decline to admit the materials. See, e.g., *Cross* v. *Huttenlocher*, 185 Conn. 390, 397, 440 A.2d 952 (1981). *Huttenlocher* is instructive because, in that case, the trial court properly declined to admit a medical study that addressed a drug similar, but not identical, to the one at issue and found side effects different from those alleged. See id., 398. The clear implication of this court's decision in *Huttenlocher* is that, had the study been more directly on point, as are the studies at issue in the present case, reading and drawing conclusions from the study would have been well within the purview of the jury.

[31] It bears emphasizing in this regard that Connecticut has a more liberal rule governing the use of scientific journal articles and other learned treatises than do many of our sister states. See, e.g., *Filippelli* v. *Saint Mary's Hospital*, supra, 319 Conn. 135–36. Specifically, once an expert witness has qualified an article as admissible under § 8-3 (8) of the Connecticut Code of Evidence, that article may be admitted as a full exhibit and, if not otherwise limited by the trial court, used by the jury for any purpose during its deliberations, despite "the danger of misunderstanding or misapplication by the jury . . . ." (Internal quotation marks omitted.) Id., 140; see E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 7.9.1, p. 469.

[32] Although it is impossible to know for certain what was said in chambers, the plaintiffs have represented that the trial court indicated that it was aware of but declined to consider certain potentially relevant evidence, such as the cited studies.

Fajardo *v.* Boston Scientific Corp.

must defer, as the majority appears to believe. See footnote 13 of the majority opinion; see also, e.g., *Brown* v. *Robishaw*, 282 Conn. 628, 633, 922 A.2d 1086 (2007) (whether evidence presented reasonably supports particular request to charge is question of law subject to plenary review). Had the trial court excluded any of the evidence that I have cited, then that decision would be subject to deference and reviewable only for abuse of discretion. But once the evidence was admitted without limitation, the jury was free to consider it for any purpose, and it is inappropriate for the majority to direct otherwise.

D

Fourth, returning to where we began, I am concerned that the majority not only fails to construe the evidence in the light most favorable to the plaintiffs, as required by law, but also steps into the jury's role by making its own assessments of the strength of the plaintiffs' evidence and the credibility of their witnesses, ultimately downplaying any evidence that supports the requested instruction while highlighting conflicting evidence. Two examples illustrate this slippage.

First, the majority determines that Bercik cannot credibly opine as to the question of a reasonable alternative design merely because, although Bercik knew that the Obtryx was fabricated from the Marlex brand of type 1 microporous polypropylene, he was uncertain whether the TVT was made from the same brand of that material. See footnote 22 of the majority opinion. On the basis of this one statement, which a reasonable juror may deem wholly insignificant, the majority finds that Bercik "[knew] next to nothing about the design features of the Obtryx . . . ." Part II E of the majority opinion. The majority never explains why Bercik's lack of knowledge as to the brand of polypropylene used in the *TVT* says anything about his knowledge of the

Fajardo *v.* Boston Scientific Corp.

design features of the *Obtryx*; nor does it tell us why the brand of plastic used would be relevant to any of the defects under discussion. Bercik is a surgeon, who implants slings into women and removes them when they have proven to be ineffective or defective. On the basis of that experience, he testified about his and several of his colleagues' strong preference for slings, such as the TVT, that use a retropubic approach. In combination with the other evidence of record, the jury reasonably might have found this testimony compelling and relevant, or not. But it is not this court's role to deem the testimony unimportant or unpersuasive, and certainly not on such arbitrary grounds.

Second, rather than taking at face value the medical research in evidence that indicated that the Ethicon TVT is the gold standard treatment for female incontinence, that the TVT has a lower rate of complications, and that the "TVT should remain the midurethral sling procedure of choice," the majority dwells at length on other evidence that arguably called into question whether the TVT is, in fact, a superior product. I understand that the plaintiffs did not demonstrate the superiority of the TVT or the defectiveness of the Obtryx to the satisfaction of the majority. The only question before us, however, is whether there was some minimal quantum of evidence from which the jury reasonably could have been persuaded of those allegations. Clearly there was.

It is not our role to make assessments of this nature under these circumstances. Our only proper role, given the procedural posture in which this case reaches us, is to assess whether there was sufficient evidence from which a reasonable, properly instructed jury could have found that the Obtryx is defective because its design renders it unreasonably dangerous and there is a feasible alternative design that would have reduced the risks of the types of injuries that Fajardo suffered. Before

Fajardo *v.* Boston Scientific Corp.

the majority upholds the trial court's instructional error, it was compelled to marshal the evidence of record in the manner that *best* supported the requested instruction, and only then to explain why that evidence, so construed, was legally insufficient. I do not believe it has done so.

IV

There is evidence in the record from which the jury reasonably could have found that (1) the Ethicon TVT is a feasible, federally approved, and widely used product that was a suitable candidate to treat Fajardo's condition, (2) the Obtryx differs from the Ethicon TVT primarily with respect to the former's heat-sealed middle section, detanged edges, and transobturator approach, (3) those particular features of the Obtryx tend to increase its stiffness and have been linked to higher incidences of the injuries that Fajardo suffered relative to the TVT, and (4) according to Rosenzweig, the plaintiffs' primary design expert, those features are defects— their increased risks outweigh any benefits—that were responsible for Fajardo's injuries. If the jury had been instructed in accordance with *Bifolck* and had found for the plaintiffs on that theory, it is inconceivable to me that, on this record, we would have concluded that there was insufficient evidence and overturned the verdict. In my view, no more was necessary to warrant a reasonable alternative design instruction and put the issue before the jury. Accordingly, I respectfully concur in part and dissent in part.